909 So.2d 1151 (2005)
Jason Todd HORN, Appellant,
v.
Karen Camille Brown HORN, Appellee.
No. 2003-CA-01744-COA.
Court of Appeals of Mississippi.
January 25, 2005.
*1154 Benny McCalip "Mac" May, attorney for appellant.
Steven Glen Roberts, attorney for appellee.
Before BRIDGES, P.J., CHANDLER and GRIFFIS, JJ.
CHANDLER, J., for the Court.
¶ 1. The Chancery Court of DeSoto County granted Karen Camille Brown Horn a divorce from Jason Todd Horn on the ground of habitual cruel and inhuman treatment. Jason appeals, and argues that (1) the evidence did not support the grant of a divorce on the ground of habitual cruel and inhuman treatment; (2) comments by the chancellor at the trial indicated the chancellor pre-judged the issue of custody; (3) the chancellor misapplied the Albright factors; (4) the chancellor's visitation award was erroneous; and (5) the chancellor erroneously divided the parties' assets.
¶ 2. Finding error only in the chancellor's deficient findings regarding the property *1155 division, we affirm in part and reverse and remand in part.

FACTS
¶ 3. Jason and Karen Horn were married on September 15, 1999. During the marriage, the couple had one child, Kaelyn Gabrielle Horn, who was three years old at the time of the trial. In October 2001, Karen informed Jason that she wanted a divorce. Jason moved out of the marital home on December 7, 2001.
¶ 4. On December 19, 2001, Karen filed a complaint for a divorce on the ground of habitual cruel and inhuman treatment or irreconcilable differences and requesting joint legal custody of Kaelyn, with Karen having physical custody. On January 28, 2002, Jason answered and counterclaimed for a divorce on the ground of habitual cruel and inhuman treatment or irreconcilable differences and requesting full custody of Kaelyn. Karen answered the counterclaim and moved for temporary custody and other temporary relief. The record reflects that the parties were unable to obtain a ruling from the chancery court on the temporary relief issues. Therefore, the parties themselves agreed upon a temporary joint custody arrangement in which they exchanged Kaelyn every three days.
¶ 5. The trial occurred in May 2003. The chancellor granted Karen a divorce on the ground of habitual cruel and inhuman treatment. The chancellor awarded Karen legal and physical custody of Kaelyn, granted Jason visitation rights, and ordered Jason to pay child support in the amount of $280 per month. The chancellor awarded Karen the majority of the parties' assets and debt.

STANDARD OF REVIEW
¶ 6. This Court adheres to a limited standard of review in domestic relations matters. Pearson v. Pearson, 761 So.2d 157, 162(¶ 14) (Miss.2000). We may disturb the chancery court's decision only if the chancellor's findings were unsupported by substantial evidence and were manifestly wrong or clearly erroneous, or if the chancellor applied an incorrect legal standard. Id. We review the facts underlying a divorce decree in the light most favorable to the appellee. Fisher v. Fisher, 771 So.2d 364, 367(¶ 8) (Miss.2000).

LAW AND ANALYSIS

I. DID THE CHANCELLOR ERR IN GRANTING A DIVORCE TO KAREN ON THE GROUND OF HABITUAL CRUEL AND INHUMAN TREATMENT?
¶ 7. The ground for divorce of habitual cruel and inhuman treatment must be proven by a preponderance of the credible evidence. Chamblee v. Chamblee, 637 So.2d 850, 859 (Miss.1994). The offending spouse's behavior must either:
(1) endanger life, limb, or health, or create a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief, or (2) be so unnatural and infamous as to make the marriage revolting to the non-offending spouse and render it impossible for that spouse to discharge the duties of marriage, thus destroying any basis for its continuance.
Crenshaw v. Crenshaw, 767 So.2d 272, 275(¶ 11) (Miss.Ct.App.2000) (citing Daigle v. Daigle, 626 So.2d 140, 144 (Miss.1993)). The conduct must consist of "something more than unkindness or rudeness or mere incompatibility or want of affection." Daigle, 626 So.2d at 144 (quoting Smith v. Smith, 614 So.2d 394, 396 (Miss.1993)). Generally, to show habitual cruel and inhuman treatment, the offending party's cruel and inhuman conduct must be shown to have been systematic and continuous. Id.
*1156 ¶ 8. Karen testified that Jason slept on the couch for the duration of the marriage. She said that Jason had a quick temper and often became angry, sometimes not speaking to her for days at a time. He falsely accused Karen of having affairs and called her a "slut." Several mornings before Karen went to work, Jason trapped her in the bathroom and yelled at her through the door. Karen stated that after she told Jason she wanted a divorce, Jason became physically abusive on multiple occasions. He had frequent bouts of anger in which he yelled at Karen and called her names, pulled her hair, and pushed her, once bruising her leg. Jason often followed and berated Karen as she spoke to her sisters on the phone. Once, when Karen was on the phone with her sister Penny, Jason pulled the telephone from the wall and struck Karen's foot with it. Karen submitted a photograph of her bruised foot. Another time, Jason became furious and began "thumping" Karen on the head. Jason also expressed wishes that Karen would die. When Karen was on the phone with her sister Michelle Shackelford, Jason said "he wished that he could hug [Karen's] body up to a can of gasoline and that it would explode and burn [Karen's] body up." Michelle overheard this statement. Karen testified that she lost twenty-five pounds during this period and developed a spastic colon.
¶ 9. Michelle described Jason as a moody person who often became enraged over minor annoyances. She said that many times when she was on the phone with Karen, Jason would follow Karen around the house, calling Karen and Michelle derogatory names. Michelle did not witness any incidents of violence, but observed Karen with bruises which Karen attributed to Jason.
¶ 10. Penny Wilson, Karen's sister, said that during the marriage, Jason often threw temper tantrums and would become "raging mad." She said Jason was jealous of Karen's spending time with her family. Jason frequently refused to talk to Karen for a number of days and told Penny that this was for punishment. Once, Jason became enraged because he thought, incorrectly, that Penny and Karen were talking about him on the phone. While Penny listened through the phone, Jason cursed, stated that he was going to rip the phone from the wall, and squeezed Karen's fingers together. Penny later observed Karen's swollen fingers. She also saw Karen's bruised foot; Karen said Jason had ripped the phone from the wall and struck her foot with it. Another time, Penny was on the phone with Karen when Jason began pulling Karen's hair. Penny overheard Karen begging him to stop. At the trial, Jason maintained that he and Karen fought but that he never became physically violent with Karen.
¶ 11. The chancellor held that Karen had shown by the preponderance of the evidence that Jason had committed acts which, taken as a whole, evinced habitual cruel and inhuman treatment supporting the grant of a divorce to Karen. Jason argues that the chancellor's ruling was error because all of the alleged physical abuse occurred after the parties had constructively separated and, therefore, there was no causal connection between the abuse and the separation. Alternatively, he argues that the evidence was insufficient to support a divorce on the ground of habitual cruel and inhuman treatment. We disagree with both of Jason's contentions.
¶ 12. Jason cites precedent stating that a plaintiff must show a causal connection between the defendant's habitual cruel and inhuman treatment and the parties' separation. Sproles v. Sproles, 782 So.2d 742, 747(¶ 16) (Miss.2001); Langdon v. Langdon, *1157 854 So.2d 485, 489(¶ 7) (Miss.Ct.App. 2003). Jason posits that the parties constructively separated in October 2001 when Karen told Jason that she wanted a divorce, though the parties cohabited for two months thereafter. He argues that, because the alleged physical abuse did not begin until after this "constructive separation," the abuse could not have caused the parties to separate. Therefore, he contends, Karen failed to prove the ground of habitual cruel and inhuman treatment.
¶ 13. This argument is without merit. Jason fails to cite any authority recognizing the concept of constructive separation. Moreover, were this Court to find that Karen and Jason in fact separated before the occurrence of physical abuse, that finding would not render deficient Karen's proof of habitual cruel and inhuman treatment. This is because the requirement of a causal relationship between the habitual cruel and inhuman treatment and the parties' separation has been limited such that conduct both before and after a separation may be considered in determining the sufficiency of the evidence of habitual cruel and inhuman treatment. Robison v. Robison, 722 So.2d 601, 603(¶ 4) (Miss.1998) (citing Bias v. Bias, 493 So.2d 342, 345 (Miss.1986)).
¶ 14. Next, Jason argues that the evidence was insufficient to support the ground of habitual cruel and inhuman treatment. The chancellor found that Jason threatened to set Karen on fire. Jason argues that his alleged statement that he "wished to hug Karen up to a gasoline can and that it would explode and burn Karen's body up" could not be construed as a threat to set Karen on fire. Without delving into a semantic thicket, we find that Jason's alleged wish was sufficiently threatening in character to provide a basis for the chancellor's finding that Jason threatened to set Karen on fire. Moreover, disregarding the characterization of the statement as a threat, the statement certainly was within the category of verbal abuse providing support for the ground of habitual cruel and inhuman treatment. Holladay v. Holladay, 776 So.2d 662, 677(¶ 64) (Miss.2000).
¶ 15. There was sufficient evidence in the record supporting the chancellor's determination that Karen proved the ground of habitual cruel and inhuman treatment by a preponderance of the evidence. It is within the chancellor's discretion to resolve questions of witness credibility. Sproles, 782 So.2d at 745(¶ 12). Here, the chancellor chose to credit Karen's testimony, much of which was corroborated by her sisters, regarding Jason's continual physically and verbally abusive conduct. The conduct engaged in by Jason of habitual ill-founded accusations, threats, insults, verbal abuse and acts of physical cruelty has sufficed on prior occasions to support the ground of habitual cruel and inhuman treatment. See Stone v. Stone, 824 So.2d 645, 647(¶ 5) (Miss.Ct. App.2002); Mixon v. Mixon, 724 So.2d 956, 960 (¶ 10-¶ 12) (Miss.Ct.App.1998). And, the frequent, unrelenting nature of Jason's conduct undergirded the finding that the conduct was "habitual, that is, done often enough or so continuously that it may reasonably be said to be a permanent condition." Holladay, 776 So.2d at 677(¶ 64).
¶ 16. Finally, there was ample evidence that Jason's conduct had an adverse impact on Karen. Fisher v. Fisher, 771 So.2d 364, 367(¶ 10) (Miss.2000). At the trial, Karen testified that her doctor attributed her spastic colon to stress. Jason argues that the doctor's opinion was hearsay and was erroneously relied upon by the chancellor. Jason admits that no contemporaneous objection was made to this evidence and that he raises this issue for *1158 the first time on appeal. Thus, this issue was not preserved for appellate review. M.R.E. 103(a)(1). Notwithstanding the fact that this issue is barred from review, when we disregard Karen's testimony about her spastic colon, there was sufficient evidence that Jason's conduct had rendered the marriage unsafe or revolting for Karen. Karen testified that she was afraid of Jason and she presented photographs of bruises caused by Jason. We affirm the chancellor's grant of a divorce to Karen on the ground of habitual cruel and inhuman treatment.

II. DO THE CHANCELLOR'S COMMENTS AT THE OUTSET OF THE TRIAL INDICATE THAT HE PREJUDGED THE ISSUE OF CUSTODY PRIOR TO HEARING EVIDENCE ON THE ISSUE FROM EITHER PARTY?
¶ 17. At the beginning of the trial, Karen explained that the parties had not been afforded a hearing on temporary custody and thus they decided to exchange Kaelyn every three days. Then, the following exchange occurred:
Q. Okay. So there was no court order, but, in effect, the two of you had to work out some kind of arrangement.
A. Right.
Q. Were you happy with that arrangement?
A. No.
Q. Why?
A. Uh
By the court: You don't have to worry about it. We will not leave it at that arrangement.
Then, Karen's attorney began a different line of questioning. Jason argues that the chancellor's comment demonstrated that the chancellor was biased against Jason and had prejudged the issue of custody in Karen's favor. He demands reversal of the grant of custody to Karen.
¶ 18. This is not a case in which the chancellor indicated prior to the close of evidence that he would rule in favor of one of the parties. See Morgan v. West, 812 So.2d 987, 996(¶ 32) (Miss.2002). Viewing the comment in its context, it is apparent that the chancellor was dissatisfied with the parties' self-imposed custody arrangement, planned to impose a different arrangement, and thus found it unnecessary to entertain Karen's testimony about her own dissatisfaction. The comment did not evince any improper bias against Jason or indicate the chancellor was determined at that time to grant Karen greater custodial rights than Jason. In fact, the chancellor's order indicates his decision to award legal and physical custody to Karen was made after hearing trial testimony and carefully considering each of the Albright factors to arrive at a decision in the best interest of Kaelyn. Moreover, we may not reverse upon this issue because Jason did not object to the comment when it was made. M.R.E. 103(a)(1); Moore v. Moore, 558 So.2d 834, 840 (Miss.1990). This issue is without merit.

III. DID THE CHANCELLOR ERR IN ANALYZING THE ALBRIGHT FACTORS?
¶ 19. The chancellor awarded custody of Kaelyn to Karen. Jason contends that the chancellor erroneously analyzed the Albright factors and rendered findings contrary to the evidence presented at the trial. He argues that, given the evidence, the proper arrangement was joint custody.
¶ 20. In child custody cases, the polestar consideration is the best interest and welfare of the child. Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983). In order to arrive at a custody arrangement that is in the child's best interest, the *1159 chancellor must make specific findings on each of the factors listed in Albright: 1) age, health and sex of the child; 2) determination of the parent that had the continuity of care prior to the separation; 3) which parent has the best parenting skills and which has the willingness and capacity to provide primary child care; 4) the employment of the parent and responsibilities of that employment; 5) physical and mental health and age of the parents; 6) emotional ties of parent and child; 7) moral fitness of the parents; 8) the home, school and community record of the child; 9) the preference of the child at the age sufficient to express a preference by law; 10) stability of home environment and employment of each parent; and 11) other factors relevant to the parent-child relationship. Id. Our review of the chancellor's findings is limited; we look to the evidence and testimony regarding each Albright factor to determine whether the chancellor's ruling was supported by the record. Hollon v. Hollon, 784 So.2d 943, 947(¶ 13) (Miss. 2001). As the chancellor was in the best position to evaluate the credibility of the witnesses, we give due deference to the chancellor's credibility determinations. Ivy v. Ivy, 863 So.2d 1010, 1013(¶ 10) (Miss.Ct.App.2004). We may reverse only if the chancellor abused his discretion and the decision was manifestly wrong or clearly erroneous. Hollon, 784 So.2d at 947(¶ 13).

Age, health, and sex of the child
¶ 21. The chancellor found that the age, health and sex of Kaelyn favored Karen. Though Jason does not challenge this finding, we note that, while the tender years doctrine has been weakened, there a presumption remains that the mother is best suited to raise a young child. Id. at (¶ 14).

Continuity of care
¶ 22. The chancellor found that this factor weighed equally between the parties because they had shared custody of Kaelyn since the separation.

Best parenting skills
¶ 23. The chancellor found from the testimony that Karen did most of the bathing, feeding, and disciplining of Karen and that this factor favored Kaelyn. Jason argues that this finding was manifestly erroneous because both Jason and Karen testified that Jason bathed her and both parents disciplined her. There was testimony from both parties that Jason provided care for Kaelyn including night time baths. But, Karen testified that during the marriage she bathed Kaelyn every morning, otherwise readied her for day care, and picked her up from day care even when Jason was unemployed and could have done so. There was testimony that Jason accidentally dislocated Kaelyn's arm while disciplining her. There was also evidence that, when Jason dropped Kaelyn at day care after his time with her, day care workers discovered a large bruise on Kaelyn's right thigh. Jason could not explain how the bruise occurred. We find that the chancellor's finding that this factor favored Karen was supported by substantial evidence and was not an abuse of discretion.

Which parent has the willingness and capacity to provide primary child care
¶ 24. The chancellor found that both Jason and Karen loved Kaelyn and would care for her and that this factor was equally weighted between the parties.

Employment of the parent and responsibility of that employment
¶ 25. The chancellor found that this factor favored Karen. The evidence presented at the trial showed that Jason was unemployed at the time and had been unemployed for periods totaling approximately one half of the marriage. Karen *1160 maintained full time work for the duration of the marriage and thereafter. Jason argues that this factor should have weighed for him because, being unemployed, he had more time to care for Kaelyn.
¶ 26. The chancellor's determination has substantial support in the record. It was undisputed that, when he was unemployed, Jason dropped Kaelyn at daycare every weekday for approximately nine hours per day. Further, Jason testified that he was pursuing a full time job and was determined not to remain unemployed. These facts showed Jason had no more available childcare time than Karen, and the chancellor correctly found that this factor did not weigh in favor of Jason. We observe that, given Karen's full time job, which necessitated daily day care for Kaelyn, and Jason's habit of dropping Kaelyn at day care, the parties spent approximately equal weekday time with Kaelyn and this factor should have weighed equally between the parties. However, in light of the other evidence supporting the chancellor's custody decision, we find that this error does not require reversal.

Physical and mental health of the parents
¶ 27. The chancellor found that this factor weighed in favor of Karen. He found that, while Karen appeared to be physically and mentally well, Jason had some emotional problems and refused to take medication prescribed for them. Jason argues that there was no evidence of his emotional problems. We disagree. Jason admitted seeing physicians in spring 2001 for anxiety, nervousness and difficulty sleeping. He was given three prescriptions for mood-altering drugs, but never filled the prescriptions, explaining at trial that he believed in "mind over matter" rather than medication. As discussed in Issue I, there was evidence that Jason was verbally and physically abusive to Karen over a lengthy period of time. Karen and her sisters testified as to Jason's volatile temper. The chancellor's finding that Jason had emotional problems causing this factor to favor Karen was not manifestly erroneous.

Age of the parents
¶ 28. The chancellor found this factor equally weighted. This finding was supported by the evidence that the parties were close in age.

Emotional ties of parent and child
¶ 29. The chancellor found this was equally weighted. Indeed, both parents testified as to their deep emotional attachment to Kaelyn, and there was testimony indicating that Kaelyn craved and enjoyed the company of both parents.

Moral fitness of the parents
¶ 30. The chancellor found this was equally weighted. There was no evidence of activities on the part of either parent indicating moral unfitness.

Home, school, and community record of the child
¶ 31. The chancellor found this factor was inapplicable.

Stability of home environment of each parent
¶ 32. The chancellor found that this factor weighed in favor of Karen because her family lived in close proximity and she retained the family residence. Jason contends that this factor should not have weighed against him because the chancellor erroneously held against him the fact that Karen retained the marital home, while he lived in an apartment. We find that the chancellor abused his discretion by finding that Jason's failure to retain the marital home weighed against him. "It is unfair to ask a man to leave his home[,] then use that factor to also deny him custody of his child." Lee v. Lee, 798 So.2d 1284, 1291(¶ 28) (Miss.2001).
*1161 ¶ 33. Nonetheless, the chancellor's determination of this factor in favor of Karen was substantially supported by his assigning weight to the fact that Karen's family lived nearby. Jason's extended family lived in Virginia. We have held that the presence of an extended family structure contributes to the stability of the child's life and may be considered as supporting the award of custody to one parent. Messer v. Messer, 850 So.2d 161, 167(¶ 18) (Miss.Ct.App.2003); Neville v. Neville, 734 So.2d 352, 355(¶ 10) (Miss.Ct.App.1999).

Stability of employment
¶ 34. The chancellor found this factor favored Karen. This was supported by evidence of Jason's patchy employment history and the fact that Karen remained employed throughout the marriage and thereafter.

Other factors
¶ 35. Under this heading, the chancellor cited the guardian ad litem's testimony that both physical and legal custody should have been awarded to Karen. The guardian ad litem testified that, though she was presumptively in favor of joint custody, after investigating this case she did not believe joint custody to be in Kaelyn's best interest. This was because she thought that Jason had "control issues" regarding Karen that would not allow for smooth decision-making between the parties, and because Kaelyn had been severely bruised while in Jason's care and Jason denied knowledge of how she was injured. This factor clearly favored Karen, and the chancellor was correct in so finding.
¶ 36. Notwithstanding the chancellor's two erroneous findings, we find that substantial evidence supported the award of legal and physical custody to Karen, and the decision was not an abuse of discretion or manifestly erroneous. In closing, we observe that custody decisions are not made with the object of rewarding or punishing either parent, but only upon factors relating to the child's best interest. Tucker v. Tucker, 453 So.2d 1294, 1297 (Miss.1984).

IV. DID THE CHANCELLOR ERR IN AWARDING JASON LIMITED VISITATION?
¶ 37. The chancellor granted visitation to Jason according to the Farese schedule, consisting approximately of two weekends per month, alternating holidays, and four weeks during the summer.[1] Jason argues that the amount of visitation was inadequate because it contravened the recommendation of the guardian ad litem that he be granted visitation in excess of the Farese schedule, and because four weeks of summer visitation is legally inadequate.
¶ 38. In arranging visitation, the best interest of the child should be the paramount consideration, "keeping in mind the rights of the non-custodial parent and the objective that parent and child should have as close and loving a relationship as possible, despite the fact that they may not live in the same house." White v. Thompson, 569 So.2d 1181, 1185 (Miss.1990). The chancellor's visitation decision is afforded great deference by this Court. Mixon v. Mixon, 724 So.2d 956, 961(¶ 14) (Miss.Ct.App.1998). In determining visitation, the chancellor is not bound to accept *1162 the recommendation of the guardian ad litem, and may reject the recommendation without explanation if, as in this case, the appointment of the guardian ad litem was not mandatory. Passmore v. Passmore, 820 So.2d 747 (Miss.Ct.App.2002). Thus, there was no error in the chancellor's rejection of the guardian ad litem's recommendation of visitation for Jason in excess of the Farese schedule.
¶ 39. Jason avers that the chancellor's award of four weeks of summer visitation was beyond his discretion because the case of Chalk v. Lentz, 744 So.2d 789, 792(¶ 9) quoting Crowson v. Moseley, 480 So.2d 1150, 1153 (Miss.1985) requires five weeks of summer visitation as the minimum of a "liberal visitation provision." Chalk indeed states that "children at the least are entitled to the company of [the non-custodial parent] two full week-ends a month during the school year, with the visitation to terminate late Sunday afternoon as opposed to Sunday morning, and a five-week period during summer vacation." Id. But, rather than attempting to mandate five week summer visitation for non-custodial parents, Chalk recognizes the chancellor's discretion to determine whether or not the best interest of the child demands a liberal visitation provision. Id. In the case sub judice, given the evidence of Jason's past treatment of Kaelyn and emotional problems already discussed in Issue III, the chancellor's application of the Farese schedule instead of a liberal provision was not an abuse of discretion.
¶ 40. Jason also complains about the Christmas holiday visitation ordered by the chancellor. He was awarded Christmas visitation on odd numbered years to commence at 3:00 p.m. on December 24 and ending at 3:00 p.m. on December 25, and on December 28 at 6:00 p.m. through December 31 at 6:00 p.m. Karen was granted identical visitation periods for even numbered years. Jason maintains that this schedule affords him too little time to bring Kaelyn to visit his family in Virginia over the Christmas holidays, and, therefore, impermissibly restricts the place and manner of his visitation.
¶ 41. While the chancellor may not restrict a non-custodial parent's activities during visitation without compelling reason, the chancellor has broad discretion to specify times for visitation. Porter v. Porter, 766 So.2d 55, 58(¶ 13) (Miss.Ct.App.2000). During visitation, non-custodial parents have broad authority and discretion respecting the place and manner of visitation, "subject only to the time constraints found reasonable and placed in the decree." Cox v. Moulds, 490 So.2d 866, 870 (Miss.1986). Here, the chancellor did not place express limits upon Jason's activities with Kaelyn during his Christmas visitation, but reasonably provided for both Jason and Karen to enjoy Kaelyn's company during the week of Christmas, with days and times to alternate yearly. The precise nature of Jason's visitation activities are subject only to the time constraints ordered by the chancellor. Id. This issue is without merit.

V. DID THE CHANCELLOR ERR IN HIS DIVISION OF MARITAL PROPERTY BY DISTRIBUTING THE MARITAL ESTATE IN THE ABSENCE OF ANY STIPULATIONS OR EXPERT TESTIMONY REGARDING THE VALUATION OF MARITAL PROPERTY AND BY AWARDING KAREN VIRTUALLY THE ENTIRE MARITAL ESTATE?
¶ 42. Property division in divorce cases is governed by the law enunciated in Hemsley v. Hemsley, 639 So.2d 909 (Miss.1994) and Ferguson v. Ferguson, 639 So.2d 921 (Miss.1994). Johnson v. Johnson, 650 So.2d 1281, 1287 (Miss.1994). The chancellor's initial step is to classify *1163 each asset as marital or non-marital. Id. Then, the chancellor must equitably divide the marital property according to the factors provided in Ferguson. Id. The factors are: (1) substantial contribution to the accumulation of the property, under which the chancellor should consider (a) the parties' direct or indirect economic contribution to the acquisition of the property, (b) the parties' contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties, and duration of the marriage, and (c) the contribution to the education, training or other accomplishments by the other spouse bearing on the earning power of the spouse accumulating the assets; (2) the degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise; (3) the market value and the emotional value of the assets subject to distribution; (4) absent equitable factors to the contrary, the value of assets not ordinarily subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse; (5) tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution; (6) the extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties; (7) the needs of the parties for financial security with due regard to the combination of assets, income and earning capacity, and (8) any other factor which in equity should be considered. Ferguson, 639 So.2d at 928. If, after equitable division, a deficiency remains for one party, then alimony should be considered. Id.
¶ 43. Jason and Karen submitted financial disclosures as required by Uniform Chancery Court Rule 8.05. Karen's disclosure showed her gross monthly income to be $3,378.46, with a net monthly income of $3,255.89. She listed monthly living expenses of $842.20. The assets she listed were the marital domicile estimated at $158,000 with a mortgage balance of $149,216 and an unimproved lot in Zachary Acres to which Karen did not assign a value but which had a mortgage balance of $14,763.48. Karen indicated she had made an $8,000 down payment when she bought the lot. She also listed a Pontiac Grand Prix automobile valued at between $16,200 and $15,500, with a loan balance of $4,245.94. She listed debt owed on three credit cards totaling $13,887.93. She stated that her individual retirement account contained $1,129.98.
¶ 44. Jason's financial disclosure indicated a monthly income of zero and total monthly living expenses of $1,280.99. Jason valued the marital domicile at $164,000, with a mortgage balance of $147,253.75. He did not list the lot. He valued the Pontiac Grand Prix automobile at $13,025 with no debt remaining. He listed Karen's individual retirement account, valued at $1,129.98. He did not list the credit card debt, but indicated a $400 debt to Target with a monthly installment payment of $40. He also noted that he owed his mother, Nancy Horn, $32,000. At the trial, Jason testified that his mother gave him $2,000 per month on loan for his living expenses. The parties stipulated to a division of their personal property, which was accepted by the chancery court.
¶ 45. Citing Ferguson, the chancellor found the parties had accumulated the lot, the marital domicile, and the Pontiac Grand Prix car, as well as acquiring the credit card debt and debt that remained on the lot, marital domicile, and car. The *1164 chancellor did not assign any values to these assets and debts. The chancellor held that, since Karen was the only income producing party and had been the only constant income producing party to the marriage, she should be awarded the lot, marital domicile, car, her individual retirement account, and the debt on the lot, marital domicile, car, and credit cards. He declined to award alimony to either party.
¶ 46. It is apparent from the chancellor's order that he treated all of the property listed in his order as marital, and proceeded to equitably divide it. Jason argues that the chancellor's equitable division was erroneous because the chancellor failed to value the parties' assets prior to applying the Ferguson factors and that the division was inequitable because it gave Karen far more assets than Jason. When reviewing a chancellor's equitable division of property, this Court reviews the chancellor's application of the procedure and factors articulated in Ferguson v. Ferguson, 639 So.2d 921, 927-28 (Miss.1994). Scott v. Scott, 835 So.2d 82, 85(¶ 7) (Miss. Ct.App.2002).
¶ 47. Jason argues that the chancellor's property division was erroneous because the chancellor failed to value the parties' assets before applying the Ferguson factors. Ferguson states that "[p]roperty division should be based upon a determination of fair market value of the assets, and these valuations should be the initial step before determining division." Ferguson, 639 So.2d at 928. While Ferguson instructs that expert testimony may be used to establish valuation, the chancellor may make the decision on the basis of other evidence presented by the parties. Ward v. Ward, 825 So.2d 713, 719(¶ 21) (Miss.Ct. App.2002). In cases where the chancellor failed to make findings on the fair market value of the various assets prior to division, we have reversed and remanded for such findings because "[i]t is impossible for this Court to perform its oversight responsibility in the absence of such a valuation." Scott v. Scott, 835 So.2d 82, 87(¶ 13) (Miss. Ct.App.2003); Pucylowski v. Pucylowski, 741 So.2d 998, 1002(¶ 17) (Miss.Ct.App. 1999).
¶ 48. In this case, the sole evidence of valuation before the chancellor was the parties' testimony and financial disclosures. The parties' disclosures assigned different values to the marital domicile and car, and Jason's disclosure did not list the lot or the credit card debt. The chancellor failed to make findings on the fair market value of the property from the evidence presented. As we do not know the value of the assets and debt awarded to Karen, we are unable to meaningfully review Jason's argument that the property division was unfair and inequitable. Pucylowski, 741 So.2d at 1002(¶ 17). Thus, we remand this case for detailed findings of fact and conclusions on the fair market value of the assets. As the chancellor erroneously failed to classify each asset as marital or separate and failed to make specific findings based on the Ferguson factors, we further direct the chancellor on remand to render these findings in accordance with Hemsley and Ferguson. Lauro v. Lauro, 847 So.2d 843, 847 (¶ 8-¶ 10) (Miss.2003). We do not opine on the appropriateness of the chancellor's result or imply that the result must be altered on remand. We hold only that the fact findings made by the chancellor were inadequate to allow appellate review of the property division. See Pucylowski, 741 So.2d at 1002(¶ 18).
¶ 49. The dissent to this issue argues that, notwithstanding the dictate of Ferguson, the facts of this case were such that the chancellor was not required to render findings on the values of the parties' assets and debt. In our view, a rule requiring valuation in some cases rather than others *1165 would unduly obfuscate the procedure required of our chancellors in each case. Moreover, a chancellor's rendering of fact-findings on valuation can, depending on the simplicity of the case, be a far simpler matter than posited by the dissent. We reiterate the principle that findings on valuation do not require expert testimony and may be accomplished by adopting the values cited in the parties' 8.05 financial disclosures, in the testimony, or in other evidence. Ward, 825 So.2d at 719(¶ 21); Dunaway v. Dunaway, 749 So.2d 1112, 1118(¶ 14) (Miss.Ct.App.1999).

VI. DID THE CHANCELLOR ERR IN CLASSIFYING KAREN'S CREDIT CARD DEBT AS MARITAL PROPERTY WHERE THERE WAS NO SHOWING THAT THE DEBT WAS INCURRED FOR MARITAL EXPENSES?
¶ 50. Though we are remanding on the issue of property division, we address Jason's argument that the chancellor erroneously treated the credit card debt as marital. Jason argues that the debt could not have been considered marital because Karen offered no proof the debt was marital. We observe that, because of the presumption that all property acquired during the marriage by either party is marital, Jason bore the burden of proof that this debt was Karen's separate property. Hemsley, 639 So.2d at 914. Thus, no error could be predicated upon Karen's failure to prove the debt was marital.

VII. DID THE CHANCELLOR ERR IN AWARDING KAREN THE USE, OWNERSHIP AND POSSESSION OF JASON'S CAR?
¶ 51. Jason argues that an equitable distribution of the marital property demanded that he be awarded the Pontiac Grand Prix automobile. As we are remanding for the chancellor to make detailed fact-findings on equitable distribution, we decline to address this issue.
¶ 52. THE JUDGMENT OF THE CHANCERY COURT OF DESOTO COUNTY IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED ONE HALF TO THE APPELLANT AND ONE HALF TO THE APPELLEE.
KING, C.J., BRIDGES AND LEE, P.JJ., IRVING, AND ISHEE, JJ., CONCUR. GRIFFIS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY MYERS AND BARNES, JJ.
GRIFFIS, J., Concurring in Part and Dissenting in Part.
¶ 53. I dissent from the majority's decision to reverse and remand on issues V, and I concur on all other issues.

V. Did the trial court err in his division of marital property by distributing the marital estate in the absence of any stipulations or expert testimony regarding the value of the property and by awarding Karen virtually the entire marital estate?
¶ 54. Over the last ten years, since the introduction of the concept of equitable division of assets in Hemsley v. Hemsley, 639 So.2d 909 (Miss.1994) and Ferguson v. Ferguson, 639 So.2d 921 (Miss.1994), our appellate courts have greatly complicated the chancellor's role in divorce cases. We not only require the chancellor to consider the evidence and determine the issues. Now, we require that the chancellor provide detailed findings of fact and conclusions of law on virtually every detail involved in the case. Often, as here, the facts found by the chancellor and relied *1166 upon in making the decision are readily apparent in the record. Thus, we have dramatically increased the chancellor's time and effort required in his/her determination. We have also substantially increased the parties' expense. The increase of time, effort and expense are not always necessary.
¶ 55. This divorce is not a complicated divorce action. Jason and Karen were married for two years. At the time of the chancellor's order, they were both around thirty years old. They agreed on the distribution of certain items of their personal property, each receiving certain items. The chancellor distributed four assets. His decision was based on the evidence presented, which included the parties' financial disclosures and their testimony.
¶ 56. The chancellor's order held:
IV Property and Personal Property
Based upon Ferguson v. Ferguson, 639 So.2d 921 (Miss.1994), this Court must make an equitable distribution of marital property.
These parties accumulated a lot, a marital residence, a 1999 Grand Prix, all at the same time accumulating debt to BancorpSouth for the lot, Washington Mutual debt on the marital residence, GMAC loan on the car, as well as credit card bills to Citibank, USAA, and Dillards.
Since Mrs. Horn is the only party with employment and has been the only constant income producing member of this marriage she shall be responsible for the payment of the above described debt.
And therefore equity demands that she, Mrs. Horn, be entitled to clear title, ownership and deed to:
1) Lot Six Zachary Acres,
2) Sole ownership of house and contents located at 5727 Carter Drive, Southaven, (less Mr. Horn's personal effects  clothes, etc.)
3) 1999 Grand Prix  sole ownership
4) All of her 401k and/or retirement.
No alimony shall be awarded to either party, as both are capable of similar incomes and length of marriage is short, nor shall any attorney's fees be paid by the other.
¶ 57. The majority is absolutely correct that Ferguson requires the chancellor consider the valuation of the parties's assets. However, I do not believe that the chancellor must provide us with findings of fact that support his consideration of the value of each asset. There are cases, such as this case, where the valuation of asset has little relevance to the chancellor's decision. Conversely, there are cases where it is not only appropriate but an integral part of the decision for the chancellor to state precise findings on the valuation of assets.
¶ 58. In Pucylowski v. Pucylowski, 741 So.2d 998, 1001(¶ 13)(Miss.Ct.App.1999), the chancellor considered the property settlement where the wife valued the marital assets at $1,300,000 and the husband valued the assets at $990,000. The difference of over $310,000 made it appropriate for the chancellor to make specific findings as to the value of the marital assets.
¶ 59. Jason argues that we are required to reverse this case because the chancellor did not state a specific value in his opinion for each asset. Scott v. Scott, 835 So.2d 82, 87 (Miss.Ct.App.2002), In Scott, the parties had been married for five years. Id. at 83(¶ 2). The chancellor determined that an equitable division of the property required that each party receive certain assets. Id. at 84 (¶¶ 5-6). This Court reversed and remanded the case because we determined that "the chancellor failed to evaluate the marital estate." Id. at 87 (¶ 13). We noted that there were at least six assets where "[t]he record does not *1167 reflect any information regarding the current value" and that a valuation was necessary to review the chancellor's distribution. Id.
¶ 60. Such is not the case here. Jason identifies three assets that he claims the parties disagree on the current value. The record clearly refutes such claim.
¶ 61. The first asset is the marital residence. Karen testified that it was purchased with proceeds from the sale of her home that she acquired prior to the marriage. The evidence indicated that Karen paid most if not all of the mortgage payments. Jason rarely held a job during the period that the parties were together, and the chancellor found that it was Karen's salary that allowed the parties to live in the home. For valuation purposes, Karen's financial disclosure valued the marital residence at $158,000 with an outstanding mortgage of $149,216, resulting in an estimated net equity of $8,784. Jason's financial disclosure valued the marital residence at $164,000 with an outstanding mortgage of $147,253.75, resulting in an estimated net equity of $16,746.25. Under either valuation, the amount of the equity was approximately the amount that Karen paid for the down payment. The chancellor determined that Karen would have sole ownership of the residence but she would also have the sole responsibility of paying the mortgage.
¶ 62. The second asset was identified as Lot 6, Zachary Acres. The evidence indicated that Karen bought this property prior to the marriage. Karen's financial disclosure did not include a value for Lot 6, Zachary Acres. Instead, it indicated that she paid $8,000, prior to the marriage, and agreed to make monthly payments to BancorpSouth. Her financial disclosure indicated that it had an outstanding mortgage of $14,763.48. Karen testified, without objection, that her real estate agent told her that it could be sold for $40,000. Jason did not list the Zachery Acres lot in his financial disclosure. He offered no evidence of the lot's value.
¶ 63. Jason's argument is clever, yet unconvincing. Jason claims that "neither party stated any value for the Zachary Acres property that was titled solely in Karen's name. No appraisals were ever submitted for these properties." Stated otherwise, Jason asks that we find reversible error because he did not offer any valuation evidence. Jason does not claim that he was not allowed an opportunity to present such evidence. He does not argue that the chancellor disregarded the evidence presented. He did not even testify that he should be awarded the property. Indeed, he could have offered evidence that would show how the property's value increased during the period of their marriage, but he did not. Jason chose not to offer probative evidence on the value of this property and may not now object. I cannot hold the chancellor in error because Jason failed to offer any evidence of the value of the Zachary Acres lot.
¶ 64. Indeed, I do not believe the valuation of this property is relevant to the chancellor's decision. Clearly, the chancellor recognized that Karen bought the property prior to the marriage and that little if any equity was accumulated during their short marriage.
¶ 65. The third asset was identified as Jason's 1999 Pontiac Grand Prix. Karen's financial disclosure valued Jason's 1999 Pontiac Grand Prix at $16,200 to $15,500 with an outstanding debt of $4,245.94, resulting in an estimated net equity of $11,254.06. Jason's financial disclosure valued the automobile at $13,025 with no outstanding debt, resulting in an estimated net equity of $13,025. The parties valuation is approximately the same. Jason claims that his mother paid for the automobile. *1168 However, by the wording of his order, the chancellor found that there was a debt secured by the automobile. I find that there was sufficient evidence for the chancellor to award the automobile to Karen because she had the ability to pay the debt owed or to equitably divide the assets based on their contributions, or lack thereof, to the marriage.
¶ 66. I agree with the majority that Hemsley and Ferguson require the chancellor to determine whether the assets are marital and determine a value. I do not agree that the chancellor must always specifically state his/her determination of the value of each asset. Ferguson directs that:
Property division should be based upon a determination of fair market value of the assets, and these valuations should be the initial step before determining division. Therefore, expert testimony may be essential to establish valuation sufficient to equitably divide property, particularly when the assets are as diverse as those at issue in the instant case. . . . To aid appellate review, findings of fact by the chancellor, together with the legal conclusions drawn from those findings, are required.
Ferguson, 639 So.2d at 929.
¶ 67. I do not read this language to obligate the chancellor to provide us with a finding of fact on each and every issue; for example, the exact value for each asset. Here, we have a divorce between two individuals of modest means. There were not an abundance of assets that would allow the parties to obtain expensive expert appraisals. Instead, they presented the chancellor with their own valuations. They, as the owners and purchasers of their property, certainly would have an adequate basis to testify as to their personal opinion of the value of their assets.
¶ 68. The chancellor clearly determined that Jason made few contributions, economic or otherwise, to the marital relationship. It was within the chancellor's discretion to award Karen the property that she brought into the marriage and the majority of the property accumulated during the marriage, while also requiring Karen to pay the credit card debt and automobile debt that were accumulated during the marriage. I cannot find that the chancellor committed reversible error on this issue.
¶ 69. In addition, I am compelled to comment on Jason's claim that the chancellor committed reversible error because there was an "absence of any stipulations or expert testimony regarding the value of the property." The majority furthers this suggestion of error, stating that the "sole evidence of valuation before the chancellor was the parties' testimony and financial disclosures." I read both of these statement to conclude that the only credible evidence of property valuation may be introduced by stipulation or an expert appraiser. There is no such requirement. Indeed, the parties' testimony about the value of their own property may be credible and sufficient. Under Rule 701 of the Mississippi Rules of Evidence, a lay witness may offer opinion testimony. A party in a divorce action may certainly testify as to their opinion of the value of their own property. Such testimony is within the bounds of Rule 701.
MYERS AND BARNES, JJ., JOIN THIS SEPARATE OPINION.
NOTES
[1] As stated in Hamilton v. Hamilton, 755 So.2d 528, 530(¶ 7) n. 1 (Miss.Ct.App.1999),

[t]he Farese Visitation Schedule is a model originating from chancery districts in north Mississippi. While the schedule has been referred to Mississippi case law, chancellors are vested with the authority to use their discretion in regard to the circumstances of the parties and the nature of the case in fashioning visitation schedules.
(citations omitted).