# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-00827-COA

**MICHAEL MERRITT DICKINSON**                                      **APPELLANT**

**v.**

**LISA FAZZIO DICKINSON**                                      **APPELLEE**

DATE OF JUDGMENT:                05/14/2018
TRIAL JUDGE:                     HON. D. NEIL HARRIS SR.
COURT FROM WHICH APPEALED:       JACKSON COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:          MARK H. WATTS
ATTORNEY FOR APPELLEE:           GARY L. ROBERTS
NATURE OF THE CASE:              CIVIL - DOMESTIC RELATIONS
DISPOSITION:                     AFFIRMED - 03/31/2020
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE CARLTON, P.J., GREENLEE AND TINDELL, JJ.

### TINDELL, J., FOR THE COURT:

¶1.     Michael Dickinson raises two issues on appeal relating to a decision of the Jackson County Chancery Court entered on April 20, 2017, which granted a divorce in favor of Lisa Dickinson on the ground of habitual cruel and inhuman treatment. Michael challenges the chancellor's decision to grant the cruelty-based divorce and the chancellor's valuation of the couple's marital home. Upon review, we find that substantial evidence supports the chancellor's findings, and we therefore affirm the chancellor's judgment of divorce and valuation of the marital home.

## FACTS AND PROCEDURAL HISTORY

¶2.     Michael and Lisa were married on June 5, 1995, and lived together in Jackson County,

Mississippi, until their separation in early 2014.[1] The couple had no children together, but Lisa had two daughters from a previous marriage. On April 4, 2014, Lisa filed for divorce on the ground of habitual cruel and inhuman treatment or, in the alternative, due to irreconcilable differences. On April 23, 2014, Michael filed his answer and counterclaim for divorce on the ground of habitual cruel and inhuman treatment. But Michael later withdrew his counterclaim on the first day of the couple's divorce proceedings.

¶3. Bifurcated divorce proceedings occurred on January 14, 2015, and February 6, 2015; they concluded on October 5, 2015. The chancellor heard testimony from Lisa, Michael, and Lisa's sister Laura Lindsey regarding Michael's alleged habitual cruel and inhuman treatment. On the matter of equitable distribution, Lisa and Michael presented the chancellor separate valuations on their marital home of $126,170 and $500,000, respectively. After hearing all the evidence, on October 23, 2015, the chancellor entered his "Findings of Fact, Conclusions of Law and Judgment of Law" and granted Lisa's request for a divorce based on habitual cruel and inhuman treatment. The chancellor also found that the value of the couple's marital home was $126,170 and awarded the home to Lisa.

¶4. Aggrieved, Michael appealed. This Court dismissed Michael's first appeal, finding that the chancellor's judgment did not constitute a final, appealable judgment. The chancellor then entered a ruling on April 20, 2017, and Michael raises two issues on this

[1] In their briefs, the parties state that they separated in April 2014. However, the parties' petitions for divorce and the chancellor's judgment of divorce state that the couple separated in January 2014.

appeal.[2]

## STANDARD OF REVIEW

¶5.     We apply a limited standard of review when examining a chancellor's decision in

domestic-relations matters. *Williams v. Williams*, 224 So. 3d 1282, 1284 (¶5) (Miss. Ct. App.

2017).    "Chancellors are afforded wide latitude in fashioning equitable remedies in

domestic[-]relations matters, and their decisions will not be reversed if the findings of fact

are supported by substantial credible evidence in the record." *Henderson v. Henderson*, 757

So. 2d 285, 289 (¶19) (Miss. 2000).  We review the facts involved in rendering a divorce

decree "in a light most favorable to the appellee," and unless the chancellor's judgment was

manifestly wrong, clearly erroneous, or applied an erroneous legal standard, the judgment

should stand.  *White v. White*, 208 So. 3d 587, 592 (¶10) (Miss. Ct. App. 2016).  When

reviewing a chancellor's judgment of property division, we are required "to ensure that the

chancellor followed the appropriate standards and did not abuse his discretion." *Wells v.*

*Wells*, 800 So. 2d 1239, 1243 (¶8) (Miss. Ct. App. 2001).

## ANALYSIS

[2] Michael filed a notice of appeal following the chancellor's final judgment on May 14, 2018.  Although labeled a "final judgment," the April 20, 2017 ruling did not "terminate the action," *see* M.R.C.P. 54(b), because issues of personal property remained before the chancery court.  On May 14, 2018, the chancellor determined the pending property rights, held Michael in contempt of court, and finalized an issue of attorney's fees that the court had explicitly retained (in the April 20, 2017 ruling) as an unresolved matter.  The chancellor clarified in the May 14, 2018 decree, "This is a final judgment."  The only issues on appeal relate to the April 20, 2017 decision.

3

**I.** **Whether the chancellor erroneously granted a divorce based upon habitual cruel and inhuman treatment.**

¶6. Michael first argues that the chancellor erred in granting Lisa a divorce based upon habitual cruel and inhuman treatment. Mississippi law allows for a fault-based divorce upon the ground of habitual cruel and inhuman treatment. Miss. Code Ann. § 93-5-1 (Rev. 2013). The burden of proving habitual cruel and inhuman treatment lays on the offended spouse, who "must show by a preponderance of the evidence that the offending spouse's behavior either:

> (1) endangers life, limb, or health, or creates a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief, or

> (2) is so unnatural and infamous as to make the marriage revolting to the non-offending spouse and render it impossible for that spouse to discharge the duties of marriage, thus destroying the basis for its continuance."

*Baggett v. Baggett*, 246 So. 3d 887, 892 (¶13) (Miss. Ct. App. 2017). But "[t]he offending spouse's conduct must exceed 'unkindness or rudeness or mere incompatibility or want of affection' and 'must be shown to have been systematic and continuous.'" *Id*. (quoting *Horn v. Horn*, 909 So. 2d 1151, 1155 (¶7) (Miss. Ct. App. 2005)). There must be some proof of "a causal connection between the offending spouse's conduct and the impact on the offended spouse." *Id*. "Such an inquiry is subjective, and 'the focus is on the effect the conduct has on the particular spouse, not its effect on an ordinary, reasonable person.'" *Id*. (quoting *Smith v. Smith*, 90 So. 3d 1259, 1263 (¶11) (Miss. Ct. App. 2011)).

¶7. To establish a causal connection, the offended party must corroborate his or her

testimony of the alleged treatment. *White*, 208 So. 3d at 593 (¶13).[3] "[C]orroborating evidence need not be sufficient in itself to establish habitual cruelty, but rather need only provide enough supporting facts for a court to conclude the [offended spouse]'s testimony is true." *Id.* (quoting *Smith*, 90 So. 3d at 1263 (¶12)). On appeal, Michael argues that Lisa failed to provide the evidence and corroboration required for a chancellor to grant a habitual-cruel-and-inhuman-treatment divorce. Michael further argues that Lisa failed to prove that his alleged cruel and inhuman behavior had any causal effect on Lisa or prevented her from being able to continue their marriage.

¶8.     At trial, the chancellor heard testimony from Lisa, Lisa's sister Laura, and Michael regarding his conduct throughout the twenty-year marriage. Lisa testified that when their marriage began, Michael made Lisa and her daughters excited for "a new adventure" and a new family. But that excitement ended once Michael began living with Lisa and her

---

[3] In 2017, the State Legislature revised section 93-5-1, allowing for corroboration in cases of spousal domestic abuse by "a single credible witness, *who may be the injured party*[.]" 2017 Miss. Laws ch. 427, §6 (S.B. 2680) (emphasis added). In its definition of "spousal domestic abuse," the revised statute included cases where

> the injured party's spouse engaged in a pattern of behavior against the injured party of threats or intimidation, *emotional or verbal abuse*, forced isolation, sexual extortion or sexual abuse, or stalking or aggravated stalking as defined in Section 97-3-107, if the pattern of behavior rises above the level of unkindness or rudeness or incompatibility or want of affection.

Miss. Code Ann. § 93-5-1 (Supp. 2017) (emphasis added). While we are mindful of these recent revisions, we decline to address whether they pertain to the foregoing case, as Lisa offered the testimony of her sister Laura to corroborate her own testimony of cruel and inhuman treatment.

daughters. Michael soon became a very angry person to live with and created a "miserable" and "tense" environment at home.

¶9. Lisa testified that Michael rigidly controlled every aspect of their lives, including the way in which Lisa and her daughters behaved around him. Michael would not allow Lisa and her daughters to do basic things, such as chew gum, use too much hot water, or have leftovers in the refrigerator, and he would become irate if they disobeyed him. Lisa described one instance when Michael became irrationally upset and yelled at Lisa's mother when she gave Lisa's daughter a piece of gum. On another occasion, Michael discovered pieces of dried parsley in their kitchen and proceeded to "rant and rave," screaming at Lisa for being wasteful in his home. Lisa also testified that Michael became angry if the house was not quiet at a particular time every night. Lisa described the atmosphere at night in their home as very stressful and tense because she and her daughters were afraid to accidentally wake Michael. Lisa explained that Michael's anger was so unpredictable that it often seemed like he was "looking for reasons to be riled up" at Lisa or her daughters, and this made everyone stressed and afraid to live in their own home.

¶10. Michael also prevented Lisa from cleaning their home. Lisa testified that Michael accumulated piles of trash and dishes throughout their house but forbade Lisa from throwing anything away or washing the dishes. Michael also hoarded "junk" outside their home, such as rusted nails, scraps of wood, or pieces of clay, but he yelled at Lisa for moving anything. When Lisa left the marital home, Michael had accumulated trash in almost every room of

6

their home, and he stated that he had done so in order to "punish" Lisa for moving his belongings in the past. Lisa stated she was embarrassed to have company over because their home was so disheveled, and she could only clean when Michael was away on tennis trips.

¶11. Lisa also testified that Michael hated her daughters and openly expressed that sentiment around them. Michael taught school during their marriage, and he told Lisa and her daughters that he "dealt with kids all day and didn't want to deal with Lisa's kids when he got home." Lisa's daughters eventually became so upset by Michael's behavior and distaste for them that they chose to leave Lisa's home and move in with their father. Lisa testified that once her daughters moved out, they refused to visit her and Michael, and Lisa's relationship with her daughters rapidly deteriorated from that point forward.

¶12. Lisa testified that Michael would also express his anger by using the "silent treatment" with her. Lisa explained that Michael would become so angry that he refused to speak to Lisa or acknowledge her, except to yell at her to not touch him. Michael's silent treatment also carried over into holidays and vacations. One time, Lisa testified that Michael became so angry because family members were late for a holiday meal that he locked himself in his bedroom and refused to talk to Lisa or the family members for the entire length of their stay. On another occasion, Lisa and Michael went on a trip with another couple. Michael became so furious at Lisa that he refused to speak to anyone for the remainder of the trip, and he refused to walk on the same side of the street as Lisa or the other couple. Lisa testified that Michael's silent treatment lasted for weeks or sometimes months at a time. Michael admitted

at trial that he used the "silent treatment" at least eight times during the marriage and that he went as long as eleven months without speaking to Lisa.

¶13.   Lisa also testified that Michael was possessive of her time during the marriage. Lisa taught a pottery class while they were married, and Michael would get angry if Lisa was not home right after the class ended or if she went out to eat with her students. Michael became angry if Lisa spent too much time with her friends or if she took too long to get from a friend's house back to their house. Lisa also accompanied Michael on his tennis trips, but he forbade her from talking to anyone while he played. Michael often yelled at Lisa in public if she tried to talk to any of the other wives in the bleachers instead of watching him play, and he brought his mother many times to accompany Lisa on the tennis trips to prevent her from talking to anyone else.

¶14.   Michael was also very jealous and suspicious of any man who came in contact with Lisa. Lisa testified that she could not acknowledge other males in public because Michael would threaten to "go up and punch" them. Michael also accused Lisa of infidelity on several occasions. Lisa described one incident where Michael accused her of infidelity after she hired a male photographer to take pictures of her pottery. Another accusation came when Lisa and Michael went on a double date with Laura and her boyfriend. Michael heard Lisa and Laura laughing in the backseat of the car and accused Lisa of infidelity with Laura's boyfriend, who was sitting in the front seat with Michael. Lisa testified that Michael became paranoid of her sister and friends, stating that Laura was "leading her into hell" and that her

friends were "encouraging her to have affairs."

¶15. The chancellor found the most disturbing piece of evidence to be Michael's accusations that Lisa had an affair with her male cousin after she received a Christmas card from the cousin. Lisa testified that these accusations only heightened when Lisa and Laura went to visit this cousin and his wife at their home. Michael began spreading rumors throughout their community and their church that Lisa had been unfaithful with multiple men, including her cousin. Michael corroborated this testimony at trial, continuing to accuse Lisa of being unfaithful with her cousin and stating that "he had forgiven Lisa."

¶16. Finally, Lisa testified that after she left their marital home and went to stay with Laura, Michael began following her and appearing at Laura's house uninvited. On several occasions, Michael came to Laura's house and slashed Lisa's tires. Lisa further testified that after leaving their home, Michael attempted to humiliate her by making a sign that covered the front of the home stating, "IN LOVE I WELCOME YOU (BACK)." Lisa did not discover the sign until several members of the community approached her about it. Michael also admitted at trial that he made the sign but denied following her.

¶17. Lisa testified that after twenty years of Michael's conduct, she began to feel helpless, stressed, and constantly upset. Because Michael prevented her from maintaining healthy relationships with her friends and her daughters, Lisa explained that she felt like "a shell of a person." Once she became "afraid for her mental health," Lisa sought help from a priest and a mental health counselor. Lisa also attempted to get a restraining order against Michael

9

because she was afraid to go back to their home alone to recover her personal items. Lisa further testified that she felt embarrassed and humiliated that Michael had taken their marital home, a home which she purchased prior to the marriage, and destroyed it. Lisa stated that she left the marital home because she felt like she was "on the verge of a mental breakdown."

¶18. Lisa's sister Laura also provided testimony regarding Michael's controlling behavior. Laura testified that Lisa "had a curfew" while she was with Michael and that he prevented Lisa from going out with her friends. Lisa also witnessed Michael became "emotional" and "upset" when Lisa did not do things his way. Laura also testified that Lisa and Michael lived two houses away from her during their marriage. Laura stated that Lisa had purchased the marital home prior to her marriage with Michael and that she helped Lisa renovate the home. Laura further testified that once Michael moved in, he turned the home into "a hoarding house" but forbade Lisa from cleaning it. Laura explained that Lisa was afraid to clean her own home "because of [] the treatment she would receive from Michael." Laura also witnessed many instances of Michael's "silent treatment," specifically on holidays and special occasions. Laura testified that Lisa was often in pain and embarrassed because Michael punished her by refusing to speak to anyone and locking himself in his room. Laura stated that she eventually stopped coming around Michael and Lisa during these long periods of silent treatment.

¶19. Laura further testified that Michael's treatment caused her sister to transform from a social person who loved life into a person that was scared and shutdown. Laura watched her

10

sister constantly "walk on eggshells" around Michael, afraid of making him angry. Laura also stated that the marriage caused Lisa to suffer weight loss, low self-esteem, and frequent crying outbursts. Laura testified that Lisa still suffered from some of these symptoms after the separation because Michael had been spotted "creeping" around Laura's house.

¶20. Michael contends that a lack of evidence existed for the chancellor to grant a divorce based upon habitual cruel and inhuman treatment. In divorce cases, the chancellor acts as the trier of fact and "must evaluate the sufficiency of proof based on the credibility of the witnesses and the weight of their testimony." *Shavers v. Shavers*, 982 So. 2d 397, 405 (¶41) (Miss. 2008). Because these cases are necessarily fact-intensive, chancellors use a case-by-case analysis before granting divorces on such grounds. James Shelson, *Mississippi Chancery Practice* § 38:5 (2019). "In reviewing a cruelty-based divorce, there is a dual focus on the conduct of the offending spouse and the impact of that conduct on the offended spouse." *Harmon v. Harmon*, 141 So. 3d 37, 42 (¶16) (Miss. Ct. App. 2014) (internal quotation mark omitted). We employ a subjective standard rather than an "ordinary, reasonable-person standard" in these cases and "concentrate on the conduct's effect on the particular offended spouse." *Id*. (citing *Smith*, 90 So. 3d at 1263 (¶11)).

¶21. Michael argues that the above-mentioned conduct does not rise to the level of habitual cruel and inhuman treatment. Lisa is certainly required to present evidence of more than "mere unkindness, rudeness, and incompatibility" to prove cruel and inhuman treatment. *Smith*, 90 So. 3d at 1263 (¶13). But "[t]here are many kinds of acts such as wilful failure to

11

support, verbal abuse, neglect, and the like which, if taken alone will not constitute cruelty, but when taken together will manifest a course of conduct as a whole which may amount to cruelty." *Id*. (quoting *Jackson v. Jackson*, 922 So. 2d 53, 57 (¶8) (Miss. Ct. App. 2006)). Routine and continuous conduct may also suffice to meet the cruelty burden. *Lomax v. Lomax*, 172 So. 3d 1258, 1261 (¶6) (Miss. Ct. App. 2015); *see also Burnett v. Burnett*, 271 So. 2d 90, 92 (Miss. 1972) (The "conduct must be habitual, that is, done so often, or continued so long, that its recurrence may be reasonably expected whenever occasion or opportunity present itself."). For instance, in *Harmon*, a husband's conduct included habitual jealousy and infidelity accusations, name-calling, cursing and yelling, and sexual degradation. *Harmon*, 141 So. 3d. at 40-41 (¶¶5-11). We ultimately found that the cumulative effect of the husband's actions "support[ed] a divorce based on habitual cruelty," and therefore we upheld the chancellor's decision to grant a divorce. *Id*. at 42 (¶17).

¶22.    In this case, the chancellor found that Lisa provided credible testimony and that her allegations of cruelty were sufficiently corroborated by both Laura and Michael. Lisa testified at length about Michael's conduct and how it affected her relationship with her family, her friends, and her own daughters. Laura corroborated Lisa's testimony by stating that she had witnessed Michael's controlling and volatile behavior. Laura also testified to witnessing Michael's long periods of the silent treatment, stating that such conduct became so constant that she avoided the couple during these times. Michael himself admitted to giving Lisa the silent treatment, and he admitted that he placed a sign stating "IN LOVE I

12

WELCOME YOU (BACK)" across the front of their marital home—conduct that knowingly humiliated Lisa.

¶23. The chancellor also heard testimony from Lisa and Laura regarding the harmful effects of Michael's conduct. Lisa admitted that she visited with a priest and counselor as a result of Michael's treatment because she was afraid for her mental health. Laura corroborated Lisa's testimony by explaining how Michael's control and anger over the twenty-year marriage drastically changed Lisa from an outgoing person who loved life to a frightened, blank individual who had frequent crying outbursts. Based upon the evidence, the chancellor found Lisa was entitled to a cruelty-based divorce.

¶24. We are mindful of our limited standard of review. "Once the [chancellor] has determined that the standard of proof has been met for granting a divorce on the ground of habitual cruel and inhuman treatment, we are not at liberty to disturb those findings unless we find manifest error of law or fact." *Richardson v. Richardson*, 856 So. 2d 426, 431 (¶23) (Miss. Ct. App. 2003). Here, upon review of the evidence, we find that Michael's behavior, taken as a whole, constitutes habitual cruel and inhuman treatment. We therefore find that substantial evidence supports the chancellor's judgment of divorce based upon this ground.

**II.    Whether the chancellor erred in his valuation of the couple's marital home.**

¶25. Michael also argues that the chancellor erred in the valuation of the couple's marital home. Michael concedes that neither he nor Lisa submitted formal appraisals of the home to the chancellor at trial. Rather, each party submitted their Rule 8.05 financial statements

13

with their alleged valuations of the home.[4] Michael submitted a $500,000 valuation of the home, which the chancellor found to be speculative and unsupported by any other evidence or documentation. Lisa submitted a valuation of $126,170 along with the Jackson County Tax Collector's bill and valuation statement, issued on November 26, 2014, which also valued the home at $126,170. Based upon the limited evidence presented, the chancellor valued the home at $126,170 and awarded the home to Lisa.

¶26.    Lisa argues that the chancellor appropriately valued the home based upon the limited available evidence, and she cites to *Williams v. Williams*, 264 So. 3d 722 (Miss. 2019), in support of her argument. In *Williams*, the Mississippi Supreme Court upheld a chancellor's valuation of a couple's marital property based upon limited evidence submitted by the parties. *Id*. at 728 (¶21). During the couple's divorce proceedings, the wife submitted no evidence to the chancellor related to valuation other than her Rule 8.05 statement, while the husband did provide some documentation supporting his valuation of the marital property. *Id*. at (¶18). The chancellor ultimately valued the property based upon the husband's documentation, which the wife appealed. *Id*. In upholding the chancellor's valuation, the Supreme Court stated that it "refuse[d] to blame the chancellor for a party's failure to present sufficient evidence of property value." *Id.* at (¶20). The Supreme Court further held that "the chancellor's duty is not to obtain appraisals of marital property." *Id*. (citing *Dunaway v. Dunaway*, 749 So. 2d 1112, 1121 (Miss. Ct. App. 1999)). Where the parties present the

---

[4] UCCR 8.05.

chancellor with "less than ideal" proof, the Supreme Court held that the chancellor may rightfully use the available proof to arrive to the best conclusion possible. *Id*. at (¶21).

¶27. Here, the chancellor found Michael's $500,000 valuation to be speculative and unsupported by any evidence, other than his Rule 8.05 financial statement. While Lisa also failed to submit an appraisal at trial, the chancellor found that her $126,170 valuation matched the Jackson County Tax Collector's bill and valuation. Again, we cannot fault the chancellor for the parties' lack of evidence. As such, we also cannot say that the chancellor committed manifest error by using the best information available to value the marital home.

## CONCLUSION

¶28. Upon review, we find that substantial evidence supports the chancellor's decision to grant Lisa a divorce based upon the ground of habitual cruel and inhuman treatment, and we therefore affirm the judgment of divorce. We also find that the chancellor, using the best available evidence, committed no error in his valuation of the couple's marital home. As such, we also affirm the chancellor's valuation and award of the marital home to Lisa.

¶29. **AFFIRMED.**

**BARNES, C.J., CARLTON AND J. WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, McCARTY AND C. WILSON, JJ., CONCUR. LAWRENCE, J., NOT PARTICIPATING.**

15