# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CA-00152-COA

**CYNTHIA JOHNSON DEAN**                                                                  **APPELLANT**

**v.**

**JEFFREY SCOTT DEAN**                                                                        **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 12/19/2018 |
| TRIAL JUDGE: | HON. EDWARD C. FENWICK |
| COURT FROM WHICH APPEALED: | ATTALA COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | DAVID BRIDGES |
| | BRIDGET R. TODD |
| ATTORNEY FOR APPELLEE: | LUTHER PUTNAM CRULL JR. |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 09/22/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE BARNES, C.J., McDONALD AND McCARTY, JJ.

### BARNES, C.J., FOR THE COURT:

¶1.     Cynthia Dean appeals from the judgment of the Attala County Chancery Court, which granted the parties a divorce, determined child custody and visitation, and distributed the marital property. Cynthia only challenges the property distribution. She claims error regarding the chancery court's using a four-year-old buy/sell agreement to value Jeffrey's business; finding one-half of the business to be separate property; not explicitly characterizing a $151,000 parcel of property as marital or separate property; finding thirty-seven of forty homestead acres to be separate property; and dividing the marital estate on a sixty-five percent/thirty-five percent basis in favor of Jeffrey. We find no error with these determinations and affirm the chancery court's judgment.

**STATEMENT OF FACTS**

¶2. Cynthia and Jeffrey married in March 1999 in Attala County, Mississippi. Two children were born of the marriage—a son and a daughter, who at the time of trial were nineteen and fourteen years old, respectively. The parties separated in May 2017. Jeffrey filed for a divorce in June 2017. The parties agreed to a divorce based on irreconcilable differences and to Jeffrey's having physical custody of the children. Issues submitted to the chancery court were legal custody of the children, visitation, and property distribution. This appeal concerns only property distribution.

**Employment**

¶3. When the couple married, Cynthia worked as a registered nurse. After the birth of her son, Cynthia went back to school and became a nurse practitioner in 2001 while working part-time at a medical clinic. She received a full scholarship for her education. From 2006 until 2011, Cynthia operated a profitable healthcare business for under-served children in rural areas, partnering with local schools. Jeffrey contributed $15,000 to start this business, which became successful. In 2011, Cynthia also decided to pursue a doctorate degree in nursing, which she completed in one year. At the same time, she worked part-time at the clinic earning $2,000–$2,500 per month as well as managing her healthcare business. Jeffrey contributed $20,000 for her doctorate degree. When Cynthia was in school furthering her career, Jeffrey paid all of the household and children's expenses. Jeffrey testified Cynthia held numerous jobs in nursing during their marriage, including "moonlighting" at an emergency room on the weekends.

2

¶4. Around 1987, Jeffrey began working in the heating and cooling business with his uncle Jerry McCrory. They incorporated Century Heating and Cooling (Century) in 1989 and shared equal ownership. In 2014, Jeffrey purchased McCrory's interest in the business and became the sole owner.

### Marital Problems and Cynthia's Addiction

¶5. Cynthia testified that within three months of the wedding, her marriage was "crumbling." Returning to nursing school was a distraction from her unhappy marriage. Jeffrey did not support her working, and Cynthia accused Jeffrey of controlling the finances and denying her funds if she "disobeyed him." Additionally, Cynthia claimed Jeffrey was physically and emotionally abusive to her for years, which he denied. Jeffrey did agree that the marriage was volatile.

¶6. Cynthia testified that around 2011 or 2012, in order to cope with her increasingly hostile relationship with Jeffrey, she began abusing the sleep medication Ambien. For approximately five years, Cynthia had an "active addiction," which the chancery court found negatively affected her relationship with Jeffrey and the children. In 2016, Cynthia pleaded guilty to two felony charges in Rankin County, Mississippi, for taking medicine from a medical facility and for calling in a false prescription. She was fined and placed in a pretrial diversion program. In another incident, Cynthia was arrested and charged with driving under the influence of Ambien, but the charge was dismissed. From 2015 through 2017, she attended one in-patient and at least two out-patient drug treatment centers, and her nursing license was suspended. At the time of trial in September 2018, Cynthia claimed she was

3

sober. Her nursing license was no longer suspended.

¶7. Jeffrey also entered evidence at trial showing Cynthia had wrecked three vehicles over the course of their marriage. The first accident occurred in 2014 when Cynthia ran into a tree. The second accident occurred in 2015 when Cynthia hit another vehicle head on. She attributed the accident to "sleep driving" on Ambien. The third accident occurred in May 2018 at a large interchange in Madison, Mississippi. It also involved other vehicles and left Cynthia severely injured. She attributed the accident to heavy rain. At trial, she was in a wheelchair, unable to work, and had undergone six surgeries due to this third accident.

¶8. At trial, Jeffrey sought to prove Cynthia had had at least two extra-marital affairs. He entered into evidence romantic social-media messages from August 2016 between Cynthia and a former high-school boyfriend. Then in 2017, Jeffrey hired a private investigator to surveil Cynthia. The investigator testified that in early November 2017, Cynthia was observed visiting a man for a few hours at his home in Corinth, Mississippi. Cynthia testified she had met the man, who was an insurance agent, on social media, and they had become friends. She testified she was in Corinth to sign paperwork for insurance he had sold her. The two were also observed meeting again at a hotel in Tupelo, Mississippi, over Thanksgiving weekend. Cynthia denied she was having an affair with him or anyone else.

¶9. Cynthia entered photographic evidence at trial to show Jeffrey physically abused her. She testified he beat her "many times" and gave her six black eyes, two broken ribs, and a broken finger. Jeffrey denied causing these injuries.

4

**Century Heating and Cooling Inc.**

¶10.    In 1987 or 1988, before Jeffrey married Cynthia, Jeffrey began working with his uncle in a heating and cooling business.  In 1989, Jeffrey and McCrory incorporated Century.  In 1993, Jeffrey's grandparents conveyed the land and old garage where the business is located to Jeffrey and his uncle.  When Jeffrey and Cynthia married in March 1999, Jeffrey owned fifty-percent of the business.  On September 9, 2014, Jeffrey became the sole owner of Century when he bought out his uncle's ownership interest.  The buy/sell agreement (Agreement) states Jeffrey paid McCrory $312,000 in cash for his interest in the business's building and land.  For the sale, a third-party was not hired to appraise the business, but Jeffrey's testimony showed the amount was based on how much McCrory needed for expenses until he received Social Security income in three years.

**The Marital Home**

¶11.    The marital home is located on property Jeffrey bought in 1993 before the marriage. The land is divided into three parcels of approximately forty acres, twenty acres, and sixty-five acres.  The marital home is located on approximately three acres of fenced property on the forty-acre parcel.  Early in the marriage, the parties lived in an old house on the property. In 2004 or 2005, they built the new marital house where the old house stood.  It is undisputed that Jeffrey paid the entire cost for the house, which was $283,000.  The chancery court determined all of the property was separate except the marital home and surrounding three acres because Jeffrey purchased the other acreage before the marriage.

5

**The Chancery Court's Findings**[1]

¶12.    In dividing the marital property, the chancery court provided a detailed analysis of the *Ferguson* factors.[2]  Three of the eight factors were found to favor Jeffrey, and four of the factors were not applicable.  The court found the first factor—substantial contribution to property accumulation, including direct or indirect economic contribution, contribution in marital and family stability, and contribution to the education or training of the wage-earning spouse—clearly favored Jeffrey.  The court also found any presumption of an equal contribution between the parties was rebutted.

¶13.    The chancery court found the daily diligence of Jeffrey and his uncle made Century succeed.  In 1987, Jeffrey and McCrory started the business "from scratch," and in 1999, when Jeffrey and Cynthia married, the business was going strong.  Cynthia contributed nothing to the success of the business. Instead, Cynthia had a passion for her medical career. Jeffrey supported her both times she went back to school, paying 100% of the household expenses.  Cynthia made no direct contribution to the accumulation of property.  Further,

---

[1] Although not at issue in this appeal, the chancery court awarded Jeffrey legal and physical custody of the children because of the "higher than normal level of hostility between the parties."  Cynthia was not ordered to pay child support because at the time of trial she was unemployed and still recovering from a serious automobile accident.

[2] Equitable division of property is governed by the factors set out in *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994), which, when paraphrased, include "(1) contribution to the accumulation of property, (2) dissipation of assets, (3) the market or emotional value of assets subject to distribution, (4) the value of assets not subject to distribution, (5) the tax and economic consequences of the distribution, (6) the extent to which property division may eliminate the need for alimony, (7) the financial security needs of the parties, and (8) any other factor that in equity should be considered." *Hults v. Hults*, 11 So. 3d 1273, 1281 (¶36) (Miss. Ct. App. 2009) (citing *Ferguson*, 639 So. 2d at 928).

the court found no homemaker presumption because the business had been in existence for twelve years before the marriage and because Cynthia had become a drug addict by 2011. The proof showed that not only was Cynthia admittedly addicted to Ambien, but she was abusing other drugs as well. She was let go from at least one job for stealing drugs; she forged a prescription for Adderall; and she took Xanax that was prescribed for her eldest son. A guardian ad litem reported that Jeffrey had been the primary source of stability for the children due to Cynthia's addiction. The evidence also showed the marriage was "in serious trouble" early on due to the parties' conflicting views on careers, child care, and finances. Additionally, the chancery court noted that Cynthia's personal problems ultimately cost Jeffrey a great deal of money. Cynthia wrecked three vehicles in accidents in 2014, 2015, and 2018. Jeffrey gave Cynthia over $30,000 in insurance proceeds for the first two accidents. He also lost his initial $15,000 investment in Cynthia's health-care business because she quit going to work due to her addiction. The court noted other significant financial losses, including a $5,000 fine he paid for Cynthia and $10,000 in attorney's fees related to her forged-prescription charges. He also paid $5,000 in attorney's fees for Cynthia's DUI charge.

¶14. Regarding marital and family stability, Cynthia accused Jeffrey of being a violent, controlling husband who beat her throughout the marriage. Jeffrey did not deny that at times their arguments became physical, but he denied beating her. The chancery court, however, found the extreme violence Cynthia described was not corroborated by the evidence. Jeffrey also suspected Cynthia of infidelity, which was corroborated by romantic social-media

7

exchanges between Cynthia and a former high-school boyfriend. Jeffrey also discovered sexually explicit messages between Cynthia and a man she met on social media. Cynthia traveled to meet the man in Corinth and Tupelo. The court concluded this factor clearly favored Jeffrey.

¶15. The factor of market and emotional value of assets also favored Jeffrey because the land Century is situated upon is old family land. Jeffrey grew up near this area, and Cynthia admitted she had no attachment to the land or intent to live in Attala County after the divorce. The court also found in favor of Jeffrey concerning the value of each spouse's separate estate because the evidence showed Jeffrey was a diligent saver and had accumulated assets years before he married Cynthia.

¶16. The chancery court found only one factor partially favored Cynthia—spousal use—with respect to a one-half interest in the marital home. The house and surrounding three acres were deemed marital property. The land was valued at $1,418 per acre, and the marital home, which includes a swimming pool, was valued at $283,000.

¶17. The parties' total assets were valued at $2,278,557. This figure included the business property, the marital residence, other real property, vehicles, bank accounts, and insurance policies. The chancery court identified Jeffrey's non-marital assets to be one-half of the interest in Century, the acreage surrounding the marital residence, and various real property parcels and bank accounts Jeffrey had obtained before the marriage, totaling $1,135,943. The chancery court found marital assets to be a one-half interest in Century, the marital residence and surrounding three acres, three real estate properties, and various personal

property, vehicles, bank accounts, and insurance policies, totaling $1,142,634. Cynthia was awarded thirty-five percent of the value of the marital assets, or $399,921, which was rounded up to $400,000.

## STANDARD OF REVIEW

¶18.    The reviewing court "employs a limited standard of review of property division and distribution in divorce cases." *Carney v. Carney*, 201 So. 3d 432, 439 (¶25) (Miss. 2016) (quoting *Bowen v. Bowen*, 982 So. 2d 385, 393 (¶32) (Miss. 2008)).  The reviewing court "will not disturb the findings of a [c]hancellor unless the [c]hancellor was manifestly wrong, clearly erroneous[,] or an erroneous legal standard was applied." *Id.*   Further, "[w]e will not substitute our judgment for that of the chancellor." *Id.*  "The chancellor's ruling on the division and distribution 'will be upheld if it is supported by substantial credible evidence.'" *Id.* (quoting *Mabus v. Mabus*, 890 So. 2d 806, 824 (¶72) (Miss. 2003)).

## ANALYSIS

¶19.    All five of the issues Cynthia raises on appeal involve the equitable distribution of the marital property.  In order to divide property, the chancery court must "(1) classify the parties' assets as marital or separate, (2) value those assets, and (3) divide the marital assets equitably." *Burnham v. Burnham*, 185 So. 3d 358, 361 (¶12) (Miss. 2015).  We shall discuss each issue in turn.

### I.    Valuation of Jeffrey's Business

¶20.    Cynthia claims the chancery court erred in the valuation of Century because the value of $624,000 was based on the four-year-old Agreement.  She contends the valuation was

unsupported by the evidence, and requests this Court remand the matter with instructions for the parties either to provide a more reliable method of valuation or to prove valuation through further expert testimony.

¶21.    Under the third *Ferguson* factor, the chancellor must consider "[t]he market value . . . of the assets subject to distribution." *Ferguson*, 639 So. 2d at 929. Three methods of valuation may be used to determine the market value of a business for this purpose: "(1) an asset-based approach, in which assets and liabilities are evaluated, (2) a market-based approach, in which the market is surveyed for similar sales, or (3) an income-based approach, in which a value is placed on earning potential." *Lacoste v. Lacoste*, 197 So. 3d 897, 907 (¶34) (Miss. Ct. App. 2016) (citing *Singley v. Singley*, 846 So. 2d 1004, 1011 (¶18) (Miss. 2002)). "[T]he bottom line is one must arrive at the 'fair market value' or that price at which property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell . . . ." *Id.* at 908 (¶34) (quoting *Singley*, 846 So. 2d at 1011 (¶18)).

¶22.    The court found Century's value was twice the "the negotiated price" of $312,000 for McCrory's one-half interest under the Agreement entered into between Jeffrey and McCrory in September 2014. In reaching this figure, the court acknowledged the principle that the fair market value for most property is what a willing seller will sell for and what a willing buyer will pay. *See Redd v. Redd*, 774 So. 2d 492, 495 (¶¶9-10) (Miss. Ct. App. 2000). The chancery court further found Jeffrey's initial one-half interest in Century was separate property and not subject to equitable distribution because he owned it before the

10

marriage. The chancery court found the other one-half interest in Century that Jeffrey purchased from his uncle during the parties' marriage was a marital asset.

¶23. "[D]etermining the fair market value of a closely held business interest is one of the most challenging issues in equitable distribution." Deborah H. Bell, *Bell on Mississippi Family Law* § 8.04, at 222 (2d ed. 2011). While "expert testimony may be essential to establish valuation sufficient to equitably divide property, . . . findings on valuation do not *require* expert testimony and may be accomplished by adopting the values cited in the parties' 8.05 financial disclosures, in the testimony, or in other evidence." *Jenkins v. Jenkins*, 67 So. 3d 5, 13 (¶19) (Miss. Ct. App. 2011) (emphasis added) (quoting *Redd*, 774 So. 2d at 495 (¶9); *Horn v. Horn*, 909 So. 2d 1151, 1165 (¶49) (Miss. Ct. App. 2005)). Moreover, a "chancellor faced with proof from both parties that is something less than ideal must make valuation judgments that find some evidentiary support in the record." *Stroh v. Stroh*, 221 So. 3d 399, 411 (¶38) (Miss. Ct. App. 2017) (quoting *Dunaway v. Dunaway*, 749 So. 2d 1112, 1121 (¶28) (Miss. Ct. App. 1999)).

¶24. In accepting twice the buy-out figure of $312,000 as Century's value, the chancery court apparently found both Jeffrey's and Cynthia's valuations of Century "less than ideal." At trial, Cynthia presented an expert in business evaluations and forensic accounting, Charles Rafferty, who opined that Century's value was $792,000.[3] An important aspect of

---

[3] Rafferty found the following values for Century as of March 2018: $72,000 in cash, $536,000 in accounts receivable, $113,000 in inventory, $619 in investments, and $49,481 in property and equipment after depreciation. The accounts receivable and inventory figure were estimates. Rafferty extrapolated cash-on-hand and investments from Century's end-of-year balance sheets on its 2013 through 2017 tax returns.

Rafferty's valuation was how he estimated Century's accounts receivables. Since Jeffrey testified he never kept an accounts-receivable ledger, the expert relied on an interview with Jeffrey. However, the chancery court found the evidence conflicted on these accounts because Rafferty recalled the interview differently than Jeffrey. Specifically, the conflicting evidence concerned how many contracts were outstanding, unpaid, or overdue. The chancery court therefore found Rafferty's valuation unreliable and disregarded it.

¶25. Jeffrey's valuation of Century was also problematic. Jeffrey claimed Century's value to be $344,150[4]: the value of the business vehicles was $122,500; the value of the equipment was $70,650; and the value of "the shop" (the office and warehouse from which Century operates)[5] was $151,000. Jeffrey had an expert of vehicle appraisal testify on the value of Century's trucks, while Jeffrey valued the equipment. Jeffrey had a commercial appraiser value the shop, but the figure did not include the land upon which Century is situated. Cynthia accurately points out, however, that Jeffrey did not present any figures for Century's account statements, financial statements, cash deposits, inventory, or investments. Jeffrey counters that he provided "a practical and realistic actual asset value appraisal of Century's property."

¶26. Cynthia argues that both the chancellor's value and Rafferty's appraisal are inaccurate. She claims the $312,000 "sale price" is less than the business's actual value.

---

[4] In his Rule 8.05 financial statement, Jeffrey listed Century's value at $350,650, including the shop.

[5] Cynthia claims the shop is not a corporate asset because the shop was never owned by the business but by Jeffrey and his uncle individually.

Further, she claim her own appraiser's value of $792,000 is inaccurate because it had to be based upon estimates instead of actual records, which is a claim Jeffrey makes as well. Rafferty found Century was a cash-basis business and used the asset-based approach for valuation. Because Jeffrey stated Century had no actual proof of accounts receivable, Rafferty used a database[6] to estimate Century's receivables as of March 2018 totaling $536,000. For inventory, Century's tax returns for 2014 through 2017 show it sold $5,534,575 in equipment and other goods. Even so, Jeffrey claimed he had no record of inventory in stock. Therefore, Rafferty again had to use the database and estimated Century's inventory to be worth $113,000.

¶27. Cynthia also complains the Agreement from September 2014 is four years old, and the business has changed in value since that time. Cynthia notes Century's tax returns for 2014 through 2017 show annual revenues totaling $11,691,133. She claims it is an unreasonable assumption that Century would maintain the same value from September 2014 through the time of trial, September 2018. Further, she points out that Century's intrinsic value was not even considered and contends that the sale price was merely calculated according to how much McCrory needed to support himself until he could draw full retirement. Cynthia concludes that the record does not support the finding that Century was worth $624,000. We disagree.

¶28. The chancellor properly exercised his discretion in making a value judgment by using the sale price of the Agreement to value Century instead of either party's appraisals. The

---

[6] Rafferty testified the database is often used in business evaluations. It accumulates information collected by accountants on their clients, separated by industry and region.

figure of $624,000 meets the legal standard of "'fair market value,' or that price at which property would change hands between a willing buyer and a willing seller . . . ." *Lacoste*, 197 So. 3d at 908 (¶34) (quoting *Singley*, 846 So. 2d at 1011 (¶18)). Even though the figure was arrived at by determining the amount McCrory needed until retirement, and not the value of Century's assets, this fact does not mean the figure was ambiguous or an inaccurate fair market value. Half of the figure was what McCrory was willing to sell to Jeffrey, a willing buyer, for his one-half-interest in Century. Cynthia has cited no authority that a different standard should apply because the sale was a family arrangement.

¶29. Regarding Jeffrey's inability to produce an accounts-receivable ledger and other financial statements, Cynthia's own expert testified that because Century operates on a cash basis, and the business is under a certain size, Century is under no requirement to keep such records for tax purposes. Rafferty explained that while Jeffrey probably knew what his receivables were, the figures were not in a summary form for an appraisal.

¶30. As for the fact the transaction and sale price were four years old, Cynthia provides no evidence that the business has changed value from 2014 through 2018. Further, she provides no evidence that the business was run in a different manner since 2014 that might change its value. Finally, we are not persuaded by Cynthia's argument that using the Agreement for valuation improperly introduces "goodwill" into the process, which is prohibited in Mississippi. *See id.* (Goodwill is not property and therefore "is excluded when 'valuing a business for distribution as marital property in a domestic case.'"). There is no evidence that certain goodwill intangibles like brand name or customer-employee relations

14

were used to determine the amount of money McCrory would accept from Jeffrey.[7]

¶31.    The sale price Jeffrey and his uncle negotiated accurately reflects what a willing buyer would accept from a willing seller for the business to change hands. We also cannot say further examination of figures, or another expert's appraisal, would create a more accurate valuation of Century. This issue is without merit.

## II.    Finding a One-Half Interest in Century as Separate Property

¶32.    The chancery court found Jeffrey's one-half interest in Century that he owned before marriage was separate property, while the other one-half interest he acquired from his uncle after marriage was marital property. Regarding the separate-property portion, Cynthia contends this one-half interest in Century that Jeffrey owned before the marriage is a mixed asset: the value of Century at the time the parties married is Jeffrey's separate property; but this one-half interest appreciated in value during the marriage due to Jeffrey's efforts, and therefore that value is marital property. Accordingly, Cynthia explains that Jeffrey should have only been awarded the value of the property as of the date the parties married in 1999. Because Jeffrey had the burden of proving this value and failed to do so, Cynthia argues the entire interest in Century should have been classified as a marital asset.

¶33.    Cynthia cites the following principles to support her argument. "[T]here generally

_____

[7] Further, any inclusion of goodwill in the value the Agreement would only benefit Cynthia as it was then included in the value of marital property set by the chancellor. Cynthia would then get thirty-five percent of that purported goodwill when she otherwise would not be entitled to such.

15

is a presumption that property acquired during the marriage is marital property."[8] *Yancey v. Yancey*, 752 So. 2d 1006, 1011 (¶20) (Miss. 1999). The burden of proof is on the spouse claiming property as a separate asset to rebut this presumption. *Horn*, 909 So. 2d at 1165 (¶50) (citing *Hemsley*, 639 So. 2d at 914).

> This burden goes beyond a mere demonstration that the asset was acquired prior to marriage. Where . . . there is a suggestion that the net equity in the assets may have increased due to the spouse/owner's efforts, as opposed to enhanced value passively acquired, there must be a showing such as would allow the chancellor to separate the former, a marital asset, from the latter, a non-marital asset.

*A & L Inc. v. Grantham*, 747 So. 2d 832, 839 (¶23) (Miss. 1999).

¶34. Cynthia argues that Jeffrey failed to rebut the marital property presumption and that it was his burden to do so because he claimed this property interest was a separate asset. She argues Jeffrey's separate-property portion of Century appreciated in value after the parties married, from 1999 until the parties' divorce in 2017, due to Jeffrey's active efforts. We are not persuaded by this argument.

¶35. Jeffrey never claimed Century's one-half property interest was a separate asset—it was the chancellor's determination. Cynthia did not raise this issue before the chancery court. Her argument is a novel attempt on appeal to obtain a greater share of Jeffrey's business. Of course, on appeal Jeffrey does not have the burden of proving the chancellor erred—Cynthia does. Further, Cynthia makes the claim to appreciated value of Jeffrey's separate property interest for the first time on appeal. To establish any appreciation, the

---

[8] This is a more accurate statement of law than the standard Cynthia claims, which is that "all property on hand at the time of divorce is presumed to be marital property."

16

value of the business at the time of marriage in 1999 and at the time of trial in 2018 were needed. Cynthia acknowledges that neither party provided these figures, and thus the only issue before this Court is which party had the burden of proof.

¶36. This Court in *Kimbrough v. Kimbrough*, 76 So. 3d 715, 720 (¶22) (Miss. Ct. App. 2011), provided the following guidance:

> "A business interest owned prior to marriage is the separate property of the owning spouse, at least to the extent of its value at the time of the marriage." Deborah H. Bell, *Bell on Mississippi Family Law* § 8.03[2] (citing *Craft v. Craft*, 825 So. 2d 605, 609 (¶14) (Miss. 2002)). Appreciation of a separate business interest, which occurs during the marriage and is attributable to the efforts of either spouse, is marital property. *Id.* at § 8.03[3][b] (citing *Craft*, 825 So. 2d at 609 (¶14)). *The burden of proof is on the non-owning spouse to show both the appreciation in value of the separate business interest and that such appreciation was attributable to the efforts of either spouse. Waring v. Waring*, 747 So. 2d 252, 256 (¶18) (Miss. 1999).

(Emphasis added).

¶37. The facts in *Kimbrough* are analogous to the case here. The wife argued on appeal that the chancellor erred in classifying the husband's motorcycle repair business as separate property, thereby excluding the wife from any interest in it through equitable distribution. *Id.* at 720 (¶21). The husband had owned the business for eighteen years prior to the marriage; so it was undisputably separate property. *Id.* at 720-21 (¶23). However, this Court acknowledged that "[a]ny appreciation in value of the business during the marriage attributable to [the husband's or wife's] efforts could be marital property. However, [the wife] did not offer any evidence of such appreciation. As a result, the chancellor could not have awarded her any interest in [her husband's] business." *Id.* at 721 (¶23).

¶38. Under the applicable law, Cynthia, not Jeffrey, would have had the burden of proof

17

before the chancery court because she was the individual making the claim that the separate property appreciated. If proved, she would then have to show the increase was caused by the active efforts of either party. However, she failed to make this claim or meet her burden. Accordingly, the chancery court did not err in finding the initial one-half interest in Century was Jeffrey's separate property.

### III. Century Heating and Cooling Shop

¶39. Cynthia argues that because Century's shop was not specifically mentioned in the final judgment, the chancery court failed to characterize it as marital or separate property and failed to value or distribute it. She states the practical result of this failure is that the chancery court awarded the shop entirely to Jeffrey, and Cynthia did not receive her share of the marital portion of the shop. She claims the chancery court's failure is reversible error.

¶40. "A failure to classify property does not automatically result in reversible error if the division of property is fair." *Holman v. Holman*, 231 So. 3d 183, 187 (¶19) (Miss. Ct. App. 2017) (quoting *Dykes v. Dykes*, 191 So. 3d 1287, 1291 (¶26) (Miss. Ct. App. 2016)). "However, a 'failure to classify a material asset is grounds for reversal on appeal.'" *Id.* (quoting *Strong v. Strong*, 981 So. 2d 1052, 1055 (¶18) (Miss. Ct. App. 2008)).

¶41. Cynthia refers to "the shop" as the "$151,000 parcel of property." Jeffrey had the shop appraised by Wyatt Roberts, who valued it at this amount. The appraisal, which was for both the building and the land, was entered into evidence and was undisputed.

¶42. Cynthia contends that because the shop was not specifically mentioned in the chancellor's judgment, which it was not, the property was not considered in the property

18

distribution. We disagree. The chancery court included the shop property's value within Century's valuation. The court based Century's valuation on the Agreement, where the shop was included in the negotiated buy-out price. Also, in his judgment, the chancellor listed the "Business Property" several times in relation to Century's valuation of either the one-half interest of $312,000 or the full interest of $624,000. Further, as Jeffrey explains, the inclusion of the parcel in Century's value is supported by substantial evidence in the record.

¶43.    Jeffrey testified that the lot upon which the Century shop was built was deeded to Jeffrey and his uncle in May 1993 from Jeffrey's parents and grandparents. The warranty deed was entered into evidence. When Jeffrey and his uncle entered into the Agreement in 2014, McCrory agreed to sell to Jeffrey all stock and assets of Century, including the shop, office building, and land. Two provisions in the Agreement specifically included the shop. Section 1 on the topic of "ownership and purchase price" states, "In addition to the above, and at no additional consideration, seller shall execute and deliver to Jeffrey S. Dean, in his individual capacity, seller's one-half undivided interest in the building and real estate currently used and occupied by the corporation as its office and shop." Section 5 entitled "documents to be executed" states, "Seller is to convey by Warranty Deed to Jeffrey S. Dean, individually, Seller's one-half undivided interest in the buildings and land where the corporation has its office and shop."

¶44.    Since the shop was in Jeffrey's name, Cynthia argues that Jeffrey individually—and not Century—owned it, and thus the chancellor considered it separate property. We see no evidence in support of this contention either in the record or the chancellor's judgment.

19

Further, Jeffrey considered the property Century's asset even though it was titled in his name. During Jeffrey's cross-examination, he testified, "Century built the building. And Century's paid for everything. We didn't pay for it out of pocket."

¶45. Just because the chancellor did not list Century's building and land separately in his judgment does not mean it was not included within Century's characterization, valuation, and distribution. Under the language of the Agreement upon which the chancellor based his ruling, Century's building and land were included. We find no error.

### IV. Acreage Surrounding Marital Home

¶46. Cynthia argues the chancellor erred in finding thirty-seven of the forty acres surrounding the marital home to be separate property. The parcel was valued at $1,418 per acre. Therefore, Cynthia claims Jeffrey erroneously received $52,466 from the marital estate.

¶47. In equitable distribution, "[t]he chancellor's first step is to classify each asset as marital or non-marital." *Larue v. Larue*, 969 So. 2d 99, 104 (¶11) (Miss. Ct. App. 2007). "Marital property can be defined as that which was acquired during the course of the marriage. Property brought into the marriage by one partner and used by the family becomes a marital asset." *Boutwell v. Boutwell*, 829 So. 2d 1216, 1221 (¶19) (Miss. 2002) (citation omitted).

¶48. The parties built their home between 2004 and 2005 on land Jeffrey had purchased from his grandmother in 1993, six years before the parties were married. The land was divided into three parcels of forty, twenty, and 64.81 acres. Jeffrey claimed homestead

20

exemption on the forty acres upon which the marital home is located. The marital home and pool are within a two and one-half to three-acre fenced-in area. The chancery court found the marital home and surrounding three acres to be marital property but the remaining acreage of the forty acres as separate property. Under the family-use doctrine, the chancellor specifically found "[t]he minimal use of this property by the family occasionally riding 4-wheelers over part of the land is insufficient to convert these parcels to marital property."

¶49. Cynthia now argues that because Jeffrey claimed the forty-acres as a homestead exemption, the chancery court should have classified it all as marital property, and not just the three acres surrounding the marital home. In support of her argument, she points to the definition of "homestead" from the Mississippi ad valorem taxation statutes:

> The word "home" or "homestead" *whenever used in this article* shall mean the dwelling, the essential outbuildings and improvements, and the eligible land assessed on the land roll actually *occupied as the primary home of a family group* . . . .

Miss. Code Ann. § 27-33-19 (Rev. 2017) (emphasis added).

¶50. We are not persuaded by Cynthia's argument. She conflates the principles of homestead exemption with those of property classification for equitable distribution. A homestead exemption allows homestead property—the land and buildings owned and occupied as a family's residence not exceeding 160 acres—to be exempt from sale by creditors for the first $75,000. Bell § 1.05[2][c], at 14-16 (citing Miss. Code Ann. § 85-3-21 (Rev. 1999)). The "homestead" principle is used in a different context and for a different purpose than categorizing property as marital or separate for equitable distribution. We can find no legal authority that states, in the context of divorce and equitable division, that

21

property included in a homestead exemption must automatically be categorized as marital, or is somehow converted to marital property.

¶51. Of course, the tract's remaining thirty-seven acres could be converted to marital property through co-mingling or family-use. "Assets which are classified as non-marital . . . may be converted into marital assets if they are commingled with marital property or utilized for domestic purposes, absent an agreement to the contrary. *Boutwell*, 829 So. 2d at 1221(¶20) (citing *Heigle v. Heigle*, 654 So. 2d 895, 897 (Miss. 1995)). However, Cynthia does not make this argument, and there is no evidence to support it. We find the chancellor did not err in categorizing the thirty-seven acres surrounding the marital home as Jeffrey's separate property.

## V.    Division of the Marital Estate

¶52. Cynthia finally argues the chancery court erred in dividing the marital estate on a sixty-five percent/thirty-five percent basis in favor of Jeffrey.

¶53. After analyzing the *Ferguson* factors, the chancery court awarded Cynthia thirty-five percent of the value of the marital estate ($1,142,634), which was rounded up to $400,000. Cynthia argues that two of the court's *Ferguson* factor findings were not supported by the evidence. For the factor regarding the "needs of the parties for financial security with due regard to the combination of assets, income, and earning capacity," Cynthia notes the chancellor found "there was no testimony about any special or unique needs of either spouse." *See Ferguson*, 921 So. 2d at 928. In making this finding, Cynthia claims that the chancery court ignored her serious car crash in May 2018, when she sustained numerous

broken bones and required several surgeries. At the time of trial, she related that she could not work or drive, had applied for Social Security Disability Income, and had more surgeries scheduled.

¶54. Cynthia also disagrees with the chancery court's *Ferguson* factor finding on "direct or indirect economic contribution to the acquisition of the property." The chancery court found "both the direct and indirect contribution to the accumulation of marital property . . . is virtually all attributable to Jeffrey's efforts, and any presumption of equal contribution has been rebutted." The court stated that the "evidence clearly showed that Cynthia made no direct contribution" and that the evidence did "not support the homemaker presumption of equal contribution."

¶55. The chancellor supported his findings with the following evidence. By 2011 Cynthia had become a drug addict, which is a claim she does not deny. Cynthia was terminated from several jobs; she either refused to go to drug treatment or would leave after a few days; Jeffrey had full responsibility for the children and the household during this time period of "active addiction" (approximately five years); evidence corroborated Jeffrey's fears about marital infidelity with two individuals; and Cynthia's personal problems cost Jeffrey "a great deal of money." The court noted that Cynthia did not request alimony and concluded that "Cynthia's contribution to the accumulation of marital assets is minimal if any. . . ."

¶56. Cynthia claims the evidence did not support these findings. She points out that she had economic contribution to the household because of her medical career as a registered nurse, and then a nurse practitioner. She ran a profitable healthcare business for four years,

23

and then received her doctorate of nursing practice. Moreover, at the time of trial she had been sober for over a year. She took care of the children when they were young, as well as performed numerous household chores when she was not in active addiction. She notes that Jeffrey did not deny these contributions.

¶57. Cynthia also claims that the unequal property division unjustifiably punished her for her addiction. Cynthia cites the supreme court's proclamation that property distribution should not be used as a means of punishment for the at-fault party. *Chamblee v. Chamblee*, 637 So. 2d 850, 863 (Miss. 1994). She also acknowledges the long established principle that "there is no automatic right to an equal division of jointly-accumulated property, but rather, the division is left to the discretion of the court." *Ferguson*, 639 So. 2d at 927 (quoting *Draper v. Draper*, 627 So. 2d 302, 305 (Miss. 1993)). Finally, she contends the court awarding Jeffrey $1,135,973 in separate property was inequitable.

¶58. We are not persuaded by Cynthia's arguments. We note, in addition to the chancellor's findings mentioned above, that Jeffrey has total responsibility for the support and care of the couple's two children, ages nineteen and fourteen. The court awarded him physical and legal custody and ordered him to pay all expenses related to the children. Further, Cynthia was not ordered to pay child support. The record shows over the course of the marriage Jeffrey has spent substantial funds purchasing Cynthia new vehicles after her accidents, investing in her healthcare business, and paying for drug treatment centers, tuition, and legal fees. Cynthia had also lost several jobs due to her drug addiction. Finally, there is no evidence that the unequal division was "punishment" for Cynthia's behaviors.

24

¶59. According to the record, Cynthia was not left destitute due to the chancery court's judgment. In May 2018 before her car accident, she was employed and earning $120,000 per year. Cynthia testified that the same "job is waiting for me. They called . . . and wanted me to come back to work in my wheelchair." However, Cynthia declined to return at that time for medical reasons. She also presented no evidence of future permanent disability from the accident.

¶60. We conclude substantial evidence supports the chancery court's *Ferguson* factor findings and property division percentages.

## CONCLUSION

¶61. The chancery court did not err in its determinations regarding the parties' property distribution. Therefore, we affirm the chancery court's judgment.

¶62. **AFFIRMED.**

**CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE AND McCARTY, JJ., CONCUR.**