# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-01246-COA

**EUGENE DAVIS, JR.**                                             **APPELLANT**

**v.**

**TONIKA DUNLAP DAVIS**                                          **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 10/22/2021 |
| TRIAL JUDGE: | HON. WILLIE JAMES PERKINS SR. |
| COURT FROM WHICH APPEALED: | LEFLORE COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | A. E. (RUSTY) HARLOW JR. |
| | KATHI CHRESTMAN WILSON |
| | MORGAN KAY JACKSON |
| ATTORNEY FOR APPELLEE: | VALERIE LANETTE DORSEY |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 05/09/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., McDONALD AND LAWRENCE, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1.     Eugene Davis appeals the Leflore County Chancery Court's final judgment granting him and his wife, Tonika Davis, a divorce on the ground of adultery. On appeal, Eugene does not challenge the chancellor's decision to grant the divorce on the ground of adultery. Eugene challenges the chancery court's division of the marital property and debts and the court's award of permanent periodic alimony to Tonika. After reviewing the record, we affirm the court's grant of divorce on the ground of adultery and reverse in part the court's judgment regarding the division of property and alimony. We remand for further proceedings consistent with this opinion.

**FACTS AND PROCEDURAL HISTORY**

¶2.     Eugene and Tonika were married on September 16, 1994, and then resided in their marital home in Leflore County, Mississippi.  Three children were born of the marriage: E.D.D. and Q.J.D, who are emancipated, and T.M.D., a minor child born in 2008.  During the marriage, Eugene had an extramarital affair and a child with another woman.  After Tonika discovered the affair, the parties separated for approximately six to eight months.  After reconciling, Tonika discovered that Eugene was having yet another affair with a different woman.  In May 2020, Eugene left the marital home.[1]

¶3.     On June 3, 2020, Eugene filed a complaint for divorce on grounds of fault and irreconcilable differences.  Eugene asserted that irreconcilable differences existed between the parties that entitled them to a divorce.  In the alternative, Eugene alleged that Tonika was guilty of habitual cruel and inhuman treatment.  Eugene requested that the court divide the parties' property and allocate the marital debts between them, that he be granted joint legal custody of the parties' minor child, and that Tonika maintain physical custody of the minor child.  In addition, Eugene also requested temporary relief for possession of the marital home.

¶4.     Tonika filed an answer and counterclaim on July 9, 2020, requesting a divorce on the grounds of constructive desertion, adultery, habitual cruel and inhuman treatment, and, in the alternative, irreconcilable differences.  In her answer, Tonika stated that Eugene was guilty of acts that "left the marriage irretrievably destroyed" and that he "had abandoned her by

---

[1]  The parties' minor child continued to live in the marital home with Tonika.

carrying on several adulterous relationships." She also alleged that Eugene had verbally and emotionally abused her in her time of emotional distress while she was grieving the loss of her mother. Tonika requested sole physical custody of their minor child and asked that legal custody be awarded to both parties. She also requested that she be granted full possession and ownership of the marital property, excluding the contents in a shed, which she asked to be awarded to Eugene. In addition, she asked that the court grant her periodic alimony in the amount of $1,500 per month, that Eugene be responsible for the four-wheeler debt, and that Eugene be required to pay off the debt on the windows purchased for the marital home. Tonika also requested an equitable division of Eugene's retirement account and any other assets he owned.

¶5. On August 12, 2020, Eugene filed an answer to Tonika's counterclaim alleging that Tonika had failed to state a claim upon which relief could be granted. He also argued that the doctrine of unclean hands and estoppel precluded Tonika from maintaining the allegations in her counterclaim. Eugene further stated that the doctrines of recrimination, provocation, reformation, ratification, and condonation also precluded Tonika's claims.

### A. Divorce Hearing

¶6. The Leflore County Chancery Court held a trial on both parties' claims on June 23, 2021. The parties were the only witnesses who testified.

¶7. Tonika testified that she was forty-five years old and had obtained a high school diploma, completed a semester in junior college, and attended Delta Beauty School. Tonika stated that she had worked for Leflore County schools for seven years, but for the last two

3

years she had been working with the Greenwood-Leflore Consolidated School District as parent/student support staff and her gross salary was approximately $2,000 per month. Tonika's Rule 8.05 financial statement listed her gross monthly income as $3,524.49, which included $515 from child support and $1,000 for spousal support from Eugene. *See* UCCR 8.05. Her net monthly income was $3,076.32, and her total monthly expenses were $2,954.19. The only real estate Tonika listed in her statement of assets was the marital home, which she valued at $76,000.

¶8. Eugene testified that he was forty-seven years old and employed as an assistant fire chief at the Itta Bena Fire Department and the transportation manager and shop foreman at Delta Health Alliance. Eugene's Rule 8.05 financial statement listed his gross monthly income as $8,992.32, which included $2,268.61 in veterans benefits,[2] and his net monthly income as $6,793.87.[3] Eugene listed his monthly expenses as $4,530.20. He also claimed the marital home, which he also valued at $76,000, and a trailer as marital assets. Eugene asserted that although his name was listed on the trailer, it was his sister's trailer and was paid for by her.

### i. Marital Property and Assets

¶9. During the hearing, Tonika requested ownership of the marital home and stated that she was currently paying the mortgage and insurance and paying for the upkeep of the home.

---

[2] At the hearing, Eugene stated that since completing his financial statement his veterans benefits had been increased from $2,268.61 to $2,500 per month.

[3] Eugene's statement also listed his adjusted gross income as $7,639.80. However, most, if not all, of the deductions listed in that category were mandatory with the exception of his medical insurance, which was voluntary.

Tonika also testified that in 2018 she paid for windows to be fixed in the marital home, and she requested that both parties be responsible for the remaining debt, which was approximately $7,000.[4]

¶10.    Tonika also requested ownership and possession of a 2013 Nissan Maxima[5] and a 2019 Altima, which her daughter possessed. Tonika stated that she would be responsible for the debt on the Altima.[6] Tonika further stated that she felt Eugene was entitled to the trailer located in Sidon that he and his sister purchased,[7] a 2007 GMC Sierra, and a 2017 Chevrolet Silverado. Tonika stated that Eugene should be responsible for the remaining debt on the Silverado, the remaining debt on his USAA credit card,[8] and the debt on a Polaris 850 four-wheeler.

¶11.    Eugene testified that Tonika could have the house and all the contents in it: "I just want my TV. The TV I just bought about a year ago. Everything else, she can have."[9]

---

[4]  Neither party listed information regarding the debt from the windows on their financial statements.

[5]  Tonika testified that the Nissan Maxima was paid for and registered in her name. According to Tonika's financial statement, the vehicle had an equity value of $7,762.50.

[6]  On Tonika's financial statement, she valued the 2019 Altima at $20,975 and listed the loan balance on the vehicle as $26,133. Tonika also stated that the vehicle had an equity of $5,158.

[7]  Eugene later testified that the trailer in Sidon was in his name but belonged to his sister, who paid the lot rent every month. The court ultimately determined that although Eugene claimed that the trailer belonged to his sister, because it was in Eugene's name it was his property and would be treated as such during the division of the parties' marital property.

[8]  According to Tonika, her name was removed from the credit card.

[9]  On his financial statement, Eugene listed a 75" television valued at $1,400.

5

Eugene further stated that he wanted all the "tubes and equipment out of the storage shed," which he claimed were worth between $3,000 and $5,000. He stated that Tonika could have the shed, her 2013 Nissan Maxima, a 2005 Altima, and a 2001 Chevrolet Blazer Extreme if she wanted it. Eugene requested that he be allowed to keep his two trucks (the 2007 GMC Sierra and 2017 Chevrolet Silverado) and the Polaris 850 four-wheeler, valued at $14,000. Eugene also agreed to pay off the USAA credit card debt. Neither party specified the debt amount on the credit card.

### ii. Parties' Retirement Accounts

¶12. Although both parties testified that they maintained accounts with the Public Employees' Retirement System of Mississippi (PERS), Tonika did not list her retirement account on her financial statement, but she testified that there was approximately $10,000 in her PERS account at the time of the hearing. Tonika also stated that she felt that Eugene was not entitled to her PERS account but requested that she be awarded half of his.

¶13. On the other hand, Eugene testified that Tonika should keep her PERS and requested that he be allowed to keep his. Eugene stated that the estimated retirement value of his PERS account was "$62,000 and some odd dollars."[10] He further stated that all of his retirement funds had been accumulated during the twenty-seven years that he and Tonika were married, except for two years before the marriage when he was in the military. Eugene stated that he

---

[10] On his financial statement, Eugene reported that the total balance of his PERS account was $62,217.43.

6

served in the military in 1992 and was not married until 1994.[11] Eugene admitted that his PERS account was substantially greater in value than Tonika's PERS account.

### iii. Spousal Support

¶14. Tonika further requested that the court require Eugene to continue paying her $1,500, which was about what she had been receiving from him since May 2020 for household bills and included the child support she received for their minor child.[12] Tonika stated that when Eugene was living in the marital home, he was giving her about $1,500, which she used to pay bills. She stated that she was seeking the same $1,500 for maintenance of the home because she now had to pay others to do certain things around the home that Eugene used to do. Although Eugene admitted that for the majority of their marriage he always made substantially more than Tonika and paid most of the bills, he stated that he did not think that he should be required to pay Tonika any spousal support because she worked at the school, styled hair, and was getting child support.

¶15. Eugene also stated that he only gave Tonika $1,000 a month after they separated because he did not want to be charged with abandonment. He further stated that he was only able to give Tonika the $1,000 because he was currently living with his sister and did not have his own house.

### iv. Bank Accounts

---

[11] Eugene did not provide the court with the value of his premarital contribution to his PERS account.

[12] Specifically, Tonika was receiving $1,000 from Eugene for support with household expenses and approximately $515 in child support.

¶16.    Tonika listed four bank accounts on her financial statement.  However, at the hearing her testimony only referenced a joint account with Eugene that she said had "four dollars and some cents in it."  Tonika stated that Eugene used this account to transfer money to her every month.  The other accounts listed on her financial statement included a joint account with her daughter, Tonika's personal checking account, and Tonika's savings account.  According to Tonika's financial statement, there was $28.71 in the joint account with her daughter; $1,831.54 in her personal checking account; and $5,370.66 in Tonika's savings account.

¶17.    Eugene testified that he had a checking account with a balance of $360.  According to his financial statement, Eugene also had two additional bank accounts: the joint account with Tonika that contained $4.44 and an account with his son that contained $705.23.

### v.    Alleged Unreported Income

¶18.    During the hearing, there was conflicting testimony regarding how much income Tonika earned from styling hair out of the marital home.  Tonika testified that she styled hair maybe once or twice a week out of the home and charged clients "maybe like $25."  During the marriage, Eugene enclosed the garage of the marital home, and Tonika initially testified that she used this space as a beauty shop.  However, when asked again, Tonika denied using the space as a beauty shop.  Tonika also stated that she was unable to give the court an exact amount for how much she was making on the hair business because the income was not steady.[13]  Tonika also stated that she had never reported any income to the Internal Revenue Service or the Department of Human Services as the result of operating a beauty shop.

---

[13] Tonika did not list the income she received from the hair business on her financial statement.

¶19.   Eugene submitted as evidence photos of Tonika's beauty supplies, clients' Facebook posts, and text messages between him and Tonika.  He stated that he did not think Tonika was being forthcoming with the court about how much she made styling hair.  He stated that despite her testimony, Tonika did in fact operate a beauty shop within their home and described her "operation" as follows:

> Basically, she did hair in the room that I closed in as the living room.  She did hair on Saturdays.  She did hair pretty much every day except for Mondays and Sundays, and that was only in the event that it wasn't a holiday.  If it was a holiday or school event that came up, like prom or program, she always rearranged her schedule to do hair.  Some days when she was working at the school, she would just take off a half a day from school to come home and do hair.  Normal days, she'll work at the school, get off at 3, and come home and do hair.

According to Eugene, although Tonika's income from styling hair varied, on average, Tonika made anywhere from $250 to $300 a day in cash.  Tonika denied this allegation, stating that she made approximately $400 a month styling hair depending on how often she got a client.  When asked if he had any concrete proof other than his testimony to support his allegation that Tonika made a substantial amount of money styling hair, Eugene responded that the

> concrete proof is, she and I have been married for over 20-something years.  Throughout the 20-something years of us being married, I have seen her count the money that she have made doing hair.  We've stayed up in bed at night, and she'd go in her pocket and pull out a wad of money and straighten it out.  I have seen this with my own two eyes.  Before we go on vacation - - before we go on vacation, Tonika always done hair days prior to have extra money on vacation.  I've seen several times before vacation where she do hair on Friday or a Thursday, Friday or whenever, that she makes money.  She make good money doing hair.

¶20.   In addition to the testimony elicited regarding Tonika's alleged additional income, it was also revealed during his cross-examination that Eugene had additional income from

fixing old cars and working on houses. Eugene admitted that the income from that work was not included in the amount he reported as his monthly income on his Rule 8.05 financial statement. Eugene also listed a business, Geno's Auto Repair, on his financial statement but did not provide a value for the business.

¶21. At the end of the hearing, the court found that there was no concrete proof in the record of Tonika's income from styling hair or Eugene's income for his mechanic and construction work. Thus, the court stated that it had no idea as to either income's total amount.

### B. Judgment for Divorce

¶22. On October 22, 2021, the chancery court issued a final judgment granting Tonika a divorce on the ground of adultery. The court stated that "the home, the several vehicles, trailer, the four-wheeler, storage shed with tools and all property acquired during the marriage" were classified as marital assets. The court stated that the testimony revealed that both parties had either directly or indirectly made economic contributions to the marital assets. The court further stated that Tonika had contributed more towards the stability of the home and harmony of the marital and family relationships. The court stated that Eugene appeared "to have spent time destroying this stability by his engagements in marital sexual activities with other women even to the extent of causing birth to a child."

¶23. The court stated that the proof presented showed the marital home had a mortgage balance of approximately $31,856, and the equity in the home was estimated to be $42,340. The court noted that Tonika expressed emotional value and ties to the marital home, her

10

desire to have ownership, and her willingness to pay the outstanding mortgage note and take care of the maintenance and upkeep. Thus, based on the *Ferguson* guidelines,[14] the court held that Tonika was entitled to exclusive use and possession of the marital home and the storage shed without the contents until T.M.D. reached the age of majority or was otherwise emancipated. The court stated that Tonika was responsible for the payment of the mortgage note, home insurance, and maintenance upkeep of the home. The court held that both parties would be responsible to pay an equal amount of the outstanding debt for windows to the home. The court stated that Eugene's equity interest in the home was terminated as of May 20, 2020, and after their minor child reaches majority age or emancipation, Eugene shall convey by quitclaim deed all of his interest in the property and shall be paid his proportionate share of equity interest in the home. The court determined that $42,340 was the established equity interest in the home at the time of the hearing and that Tonika was entitled to 60% of the equity interest, and Eugene was entitled to 40%.

¶24. The court held that Tonika was also entitled to exclusive use and possession of the furniture, appliances, other household contents, all personal property in her possession, the 2013 Nissan Maxima, the 2005 Nissan Altima, the 2001 Chevrolet Blazer, and the 2019 Altima.

¶25. The court stated that Eugene was entitled to the exclusive use and possession of all personal property in his current possession, the tools and equipment located in the storage shed, the 2007 GMC Sierra, the 2017 Chevrolet Silverado, the four-wheeler, and the TV

---

[14] *Ferguson v. Ferguson*, 639 So. 2d 921 (Miss. 1994).

11

located in the marital home that Eugene recently purchased. The court also held that Eugene would be solely responsible for the note on the four-wheeler. The court did not assign values to any of the property he awarded to Tonika and Eugene.

¶26. The chancery court also held that Tonika had no vested right in Eugene's retirement account, and likewise Eugene had no vested right to Tonika's retirement account. Thus, the court held that each party would have exclusive use and ownership of their respective PERS retirement accounts.

¶27. The court awarded Tonika alimony in the amount of $1,500 monthly. The court noted that Tonika testified, without contradiction by Eugene, that Eugene had been providing her with spousal support in the amount of $1,500 since May 2020. The court stated that based on the parties' financial statements, Eugene had a net monthly income in the amount of $6,793, and Tonika had a net income of $3,076, which included the spousal support. The court stated that Tonika's monthly income was less than half of Eugene's, and her monthly living expenses were "just short of $1,200 from being the same as [Eugene's]." The court found that the total value of Eugene's assets was $212,107, which was $134,105 more than Tonika's total value of assets. The court also stated that Tonika's liabilities were greater than Eugene's by $25,124. Therefore, based upon the *Armstrong* factors,[15] the court held that it was just and equitable for Tonika to be awarded alimony or spousal support in the monthly amount of $1,500. Payments were to commence on or before November 1, 2021, and were to continue until Eugene's death or either Tonika's death or remarriage.

---

[15] *Armstrong v. Armstrong*, 618 So. 2d 1278 (Miss. 1993).

¶28. On appeal, Eugene does not challenge the chancellor's decision to grant a divorce in favor of Tonika on the ground of adultery. Rather, Eugene asserts that the chancery court erred in determining the classification of the marital property, in dividing the parties' marital property and debts, and by awarding Tonika permanent periodic alimony.

## STANDARD OF REVIEW

¶29. Our appellate standard of review of chancery court matters is limited. *Baumbach v. Baumbach*, 242 So. 3d 193, 199 (¶19) (Miss. Ct. App. 2018). "Chancellors are afforded wide latitude in fashioning equitable remedies in domestic-relations matters, and their decisions will not be reversed if the findings of fact are supported by substantial credible evidence in the record." *Littlefield v. Littlefield*, 282 So. 3d 820, 824 (¶5) (Miss. Ct. App. 2019). "We review the facts of a divorce decree in a light most favorable to the appellee, and unless the chancellor's judgment was manifestly wrong, clearly erroneous, or based on an erroneous legal standard, the judgment should stand." *Id*.

¶30. "When reviewing [a] chancellor's judgment of property division, we are required to ensure that the chancellor followed the appropriate standards and did not abuse his discretion." *Id*. at (¶6).

## DISCUSSION

¶31. On appeal, Eugene alleges that the chancellor failed to classify the parties' assets as marital or separate property before equitably dividing the marital property. Specifically, Eugene asserts that the chancellor failed to classify the portion of his PERS retirement account that was separate property because those funds were accumulated before the

marriage and that the chancellor failed to determine the appreciation of the separate-property portion. Eugene also asserts that the chancellor erred in its award of alimony to Tonika.

¶32. Under Mississippi law, the procedure for dividing marital property has been well established. Chancellors must (1) classify the parties' assets and liabilities as marital or separate pursuant to *Hemsley*,[16] (2) determine the value of the property, and then (3) divide the marital property equitably, employing the *Ferguson* factors as guidelines in light of each parties' separate property. *Williams v. Williams*, 303 So. 3d 824, 833 (¶33) (Miss. Ct. App. 2020). "The goals of equitable distribution are fair division of marital property based on the facts of each case and termination of the legal relationship in a manner which each party may realize self-sufficiency." *Littlefield*, 282 So. 3d at 829 (¶26).

¶33. "Only marital property is subject to equitable distribution between the parties." *Id*. "As a general rule, an error in classification requires that the case be reversed and remanded for division based on proper classification." Deborah H. Bell, *Bell on Mississippi Family Law* § 6.02[1], at 144 (3d ed. 2020). However, under certain circumstances the division may be affirmed, despite a classification error, if the overall division is considered fair. *Id*; *see also Littlefield*, 282 So. 3d at 828 (¶24) (failing to classify property does not automatically result in reversible error if the division of property is fair). "Property division should be based upon a determination of fair market value of the assets, and these valuations should be the initial step before determining division." *Horn v. Horn*, 909 So. 2d 1151, 1164 (¶47) (Miss. Ct. App. 2005).

---

[16] *Hemsley v. Hemsley*, 639 So. 2d 909 (Miss. 1994).

14

## I.    Classification of Property

¶34.    In the judgment for divorce, the chancellor classified the following assets as the parties' marital property: (1) the marital home and lot, (2) the several automobiles, (3) the trailer, (4) the four-wheeler, (5) the storage shed with tools and equipment, (6) the furniture and household contents, and (7) the parties' separate PERS retirement accounts.  Eugene asserts that the chancellor erred by classifying his entire PERS retirement account as marital property without first determining the portion of the account that was separate property.  He also asserts that the court failed to determine the appreciation that had accrued on the separate portion during the two years before his marriage.

¶35.    "The Mississippi Supreme Court has recognized that a state pension such as PERS is marital to the extent it was acquired during the marriage."  Bell, *supra* ¶33, § 7.11, at 234; *see also Johnson v. Johnson*, 823 So. 2d 1156, 1161 (¶11) (Miss. 2002) ("Retirement plans are to be considered part of the marital estate if the value of the plans were accumulated during the marriage.").

¶36.    Eugene testified that he joined the military in 1992 and served for four years (two of which he was married to Tonika).  He stated that the money allocated to the account during those years he served in the military transferred to his PERS account.  However, the chancellor determined that both parties' separate PERS accounts were marital property without determining the portion of Eugene's account that was his separate property.  Specifically, the chancellor held that Tonika had no vested right to Eugene's PERS account,[17]

---

[17] Although Tonika requested a portion of Eugene's retirement account, she has not appealed her entitlement to it.

15

that Eugene had no vested right to Tonika's PERS account, and that each party would retain exclusive use and ownership of their respective accounts.

¶37. The chancellor failed to classify the portion of Eugene's PERS account that was accumulated during the two years of military service before his marriage as separate property and value the funds that were accumulated before his marriage. More concerning is the fact that the record reveals that there were other assets and debts that the court completely failed to classify, such as the guns listed on Eugene's Rule 8.05 financial statement and several debts listed on the parties' financial statements. During the hearing, both parties testified about a single USAA credit card. According to Tonika, her name had been taken off the credit card, and Eugene stated that he would take responsibility for the remaining debt on the card. Although there was no further testimony about any other liabilities of the parties, the parties listed additional credit card accounts, personal loans, and mortgages on their financial statements that were neither classified or assigned to either party.[18]

¶38. Because the parties did not provide adequate proof upon which the chancellor could

---

[18] On Tonika's financial statement, she listed several liabilities. The following were not addressed by the chancery court in the final judgment:

1. Comenity Bank/Nestgate - Balance: $82.07
2. Cornerstone/ Dept. of Ed - Balance: $5,248.00
3. Vanderbilt Mortgage - Balance: $5,907.00
4. Sheffield Financial - Balance: $5,820.00

The following liabilities, listed on Eugene's financial statement, were also not addressed by the chancery court:

1. Sheffield Financial - Balance: $5,000.00
2. Winchoice - Balance: $6,500.00
3. USSA - Balance: $291.28

16

classify the PERS account or the liabilities described in the parties' testimony and financial statements, we must reverse and remand this decision for further proceedings. *Littlefield,* 282 So. 3d at 824 (¶5). Thus, we remand this matter with instructions to have the parties submit evidence upon which the chancellor can properly classify all the parties' assets and liabilities including but not limited to Eugene's PERS account and debts listed on both parties' Rule 8.05 financial statements, as listed in footnote 18 of this opinion. In addition, the chancellor should classify and value, as discussed below, the respective businesses of the parties that might determine the overall outcome of the equitable distribution.

## II. Valuation of Property

¶39. "The foundational step to make an equitable distribution of marital assets is to determine the value of those assets based on competent proof." *Williams*, 303 So. 3d at 833 (¶35). "The valuation of the property is a question of fact," and the "chancellor has the sole authority to assess both the credibility and weight of witness testimony." *Id*. "A chancery court's findings on valuation may be accomplished by adopting the values cited in the parties' 8.05 financial disclosures, in the testimony, or in other evidence." *Doe v. Doe*, 341 So. 3d 953, 972 (¶58) (Miss. Ct. App. 2021) (quoting *Marter v. Marter*, 95 So. 3d 733, 739 (¶20) (Miss. Ct. App. 2012)). "However, when the record lacks any evidence of valuation of property, the chancery court has no basis to move forward with any equitable distribution of it." *Id.*

¶40. Based on the record, as shown through the parties' testimony and Rule 8.05 financial statements, the following marital assets were valued by the parties as follows:

17

| Asset | Value of Asset | Amount Owed on Property |
| --- | --- | --- |
| Marital Home | $76,000 | $33,652.94 |
| Household Furnishings & Appliances | $12,700 - $25,000 | $0.00 |
| Tools & Equipment | $3,000 - $5,000 | $0.00 |
| 2007 GMC | $13,000 | $0.00 |
| 2019 Altima | $20,975 | $26,133 |
| 2005 Altima | $2,000 - $2,800 | $0.00 |
| 2001 Chevrolet Blazer Extreme | $1,800 | $0.00 |
| 2013 Nissan Maxima | $7,762 - $13,000 | $0.00 |
| 2017 Chevy Silverado | $36,000 | $36,000 |
| Polaris 850 Four-Wheeler | $14,000 | $4,000 |
| Guns | $2,680 | $0.00 |
| 75" TV | $1,400 | $0.00 |
| Tonika's Hair Salon | unknown as to the value of the business as well as the income | unknown |
| Geno's Auto Repair | unknown as to the value of the business as well as the income | unknown |
| Trailer | unknown | unknown |
| Eugene's PERS | $62,217.43 | $0.00 |
| Tonika's PERS | $10,000.00 | $0.00 |

¶41.   In its final judgment, the court did not provide any values for any of the parties' assets before dividing the assets between the parties. As a result, the discrepancies in the valuations that the parties' provided were never settled. For example, Tonika valued the household furnishings and appliances at $12,700, and Eugene listed the value at $25,000. Tonika also

valued the 2013 Nissan Maxima at $7,762, and Eugene valued it at $13,000. It is impossible to know from the chancellor's judgment what values were assigned to these assets because the chancellor never resolved any of the discrepancies in valuation testified to and presented in the parties' financial statements.

¶42. Moreover, the court also failed to value (or award) certain assets altogether that were either testified to or listed in the parties' financial statements (i.e., the trailer[19]). Additionally, the court's judgment failed to address Tonika's disputed income from her hair salon, Geno's Auto Repair (a business that was listed on Eugene's financial statement), or the guns valued by Eugene at $2,680 on his financial statement. On remand, the chancellor should order that the parties provide adequate evidence as to the values of the items they claim to be marital property and report who has possession of these items. Moreover, the chancellor should include the value of each item in the equitable division.

### III.    Equitable Division of Marital Property

¶43. In determining the equitable division of the marital assets, the chancery court considered the applicable factors in *Ferguson*,[20] and awarded Tonika the marital home valued

---

[19] Although the chancery court may use the best information available to it in valuing personal property, in this case, there was no information available for the chancellor to draw upon for the value of the trailer. Neither Eugene or Tonika provided a value for the trailer in their financial statements, and neither party testified as to its value.

[20] When dividing the parties' marital property equitably, the chancellor should consider the following *Ferguson* factors:

1. Substantial contribution to the accumulation of the property. Factors to be considered in determining contribution are as follows:

a . Direct or indirect economic contribution to the acquisition of

at $42,340 and the storage shed, minus the contents inside.[21]  The court also held that Tonika

was entitled to 60% of the equity interest and that Eugene was entitled to 40% of the equity

interest in the marital home.  The court awarded Tonika the exclusive use and possession of

the property;
b.  Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and
c.  Contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets.

2. The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise.

3. The market value and the emotional value of the assets subject to distribution.

4. The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;

5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;

6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;

7. The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity; and,

8. Any other factor which in equity should be considered.

*Warner v. Warner*, 341 So. 3d 152, 162 (¶31) (Miss. Ct. App. 2022) (citing *Ferguson*, 639 So. 2d at 928).

[21]  Neither the court or either party provided a valuation for the shed.

(1) furniture, appliances, household contents, and all personal property in her possession; (2) the 2013 Nissan Maxima; (3) the 2005 Nissan Altima; (4) the 2001 Chevrolet Blazer; and (5) the 2019 Altima.

¶44. Eugene was awarded exclusive use and possession of (1) all personal property in his possession; (2) the tools and equipment located in the storage shed; (3) the 2007 GMC Sierra; (4) the 2017 Chevrolet Silverado; (5) the four-wheeler; and (6) the 75" TV recently bought by him located in the marital home.

¶45. Because the court did not provide any values for the property awarded to each party, we are unable to conduct an appropriate appellate review to determine whether the chancellor abused his discretion. *See Horn*, 909 So. 2d at 1164 (¶47) ("In cases where the chancellor failed to make findings on the fair market value of the various assets prior to division, we have reversed and remanded for such findings because it is impossible for this Court to perform its oversight responsibility in the absence of such a valuation.'" (quoting *Scott v. Scott*, 835 So. 2d 82, 87 (¶13) (Miss. Ct. App. 2002))). In addition, there were several assets listed on Eugene's financial statement that were not mentioned or addressed by the parties or the court in its final judgment. Such property included several guns valued by Eugene at $2,680 and a business listed as "Geno's Auto Repair." Although Eugene listed Geno's Auto Repair as an asset on his financial statement, he provided no value for it nor was there any specific testimony or evidence presented regarding the business. Thus, we can only infer that the chancellor did not consider the business when he divided the parties' property. In addition, we assume the court did not consider Tonika's additional income from her hair

21

salon either because there was nothing in the record to establish exactly what the income was.

¶46.    After distributing the marital property, the court held that Eugene had a "total value of all assets of $212,346.06" and that his liabilities totaled $51,719.18.  As for Tonika, the court held that she had a total value of all assets in the amount of $78,002 and that her liabilities totaled $76,843.  It appears from the record before us that these amounts may be called into question upon a second review by the chancery court.  Therefore, upon remand, the chancellor should examine the accuracy of these amounts in light of the issues of classification and valuation.

### IV.    Alimony Award

¶47.    Eugene also contends that the chancery court erred in awarding Tonika alimony. Although alimony and equitable distribution are distinct concepts, together they command the entire field of financial settlement of divorce, and where one expands the other must recede.  *Williams*, 303 So. 3d at 835 (¶41).  "Therefore, when a case is remanded for further consideration of the division of the marital assets, this Court must also remand on the issue of alimony as the proper distribution of the parties' assets and debts may affect the amount of alimony ultimately awarded."  *Id*. (quoting *Segree v. Segree*, 46 So. 3d 861, 866 (¶13) (Miss. Ct. App. 2010)).

¶48.    Because we are remanding this case to the chancery court for revision of the equitable division of the parties' marital assets and debts, we decline to rule on whether the chancery court erred in awarding Tonika alimony.  On remand, the parties should be afforded the opportunity to provide the court with not only their current Rule 8.05 financial statements but

22

also be required to present evidence establishing an accurate amount of their incomes, including income derived from all sources.

**CONCLUSION**

¶49. "We cannot hold the chancellor in error for not considering an asset [or debt] if its present disposition or even its very existence was not established at trial." *Seghini v. Seghini*, 42 So. 3d 635, 641 (¶20) (Miss. Ct. App. 2010); *see also Dunaway v. Dunaway*, 749 So. 2d 1112, 1121 (¶28) (Miss. Ct. App. 1999) (holding that a chancellor cannot be blamed for the parties' failure to present evidence). However, when it is impossible for this Court to perform its oversight responsibility in the absence of such classification and valuation, the matter must be reversed and remanded. *Horn*, 909 So. 2d at 1164 (¶47). The record in this case clearly shows that the chancery court failed to properly classify and value certain assets and debts that were presented by the parties. Therefore, we find that the judgment must be reversed in part and remanded for the chancery court to classify those assets and liabilities and provide appropriate valuations for the parties' assets.

¶50. However, we do not fault the court for the condition of the record that was presented before us. Rather, this case reflects the necessity of the parties and counsel to timely file Rule 8.05 financial statements and supplement them to the court prior to trial. Counsel should also provide the court with adequate proof of all the parties' assets and liabilities, and parties should be forthcoming regarding their incomes to ensure that the chancellor is equipped with the necessary information to render decisions in accordance with the law.

¶51. Therefore, we reverse the chancery court's overall distribution of the marital property

23

of the parties and remand so that the chancery court can classify each item noted in the analysis above as either marital or separate, value each item, and then equitably divide the property between the parties. We affirm in part the judgment as to the grant of the divorce based on the ground of Eugene's adultery.

¶52.    **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR. WILSON, P.J., AND McCARTY, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**